**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x
                                          :

IN RE FOREIGN EXCHANGE         :
BENCHMARK RATES ANTITRUST    :    No. 1:13-cv-07789-LGS
LITIGATION                             :
                                            :
                                            :
                                            :
                                            :
                                            :
-------------------------------------------------- x


**JOINT DECLARATION OF CHRISTOPHER M. BURKE AND MICHAEL D.
HAUSFELD IN SUPPORT OF (A) CLASS PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT AGREEMENTS AND (B) LEAD COUNSEL'S
MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF
LITIGATION EXPENSES**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 3

II.    FACTUAL BACKGROUND ................................................................ 8

III.    CLASS PLAINTIFFS' PROSECUTION OF THE ACTION .......................... 9

    A.    Consolidation and Appointment of Lead Counsel ................................. 10

    B.    Lead Counsel Continue to Investigate Claims and File the Consolidated Amended Class Action Complaint .................................... 12

    C.    Class Plaintiffs Oppose Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint.......................................................... 14

    D.    Lead Counsel Negotiate for Settlement Cooperation, Move to Consolidate Exchange Cases, and File the Second Amended Consolidated Class Action Complaint ................................................. 15

    E.    Class Plaintiffs Oppose Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint Pursuant to Rule 12(b)(2) and Lead Counsel File a Third Consolidated Amended Class Action Complaint to Cure Defects.............................................................. 19

    F.    Class Plaintiffs Oppose Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint Pursuant to Rule 12(b)(6) ....... 20

    G.    Further Discovery Stays, Case Management Orders, and Discovery Stipulations ........................................................................ 21

    H.    Class Plaintiffs' Discovery and Settlement Cooperation Efforts Result in Defendants' Production of Transaction Data and Documents............................. 24

        1.    Lead Counsel's Negotiations over the Scope of Defendants' Transaction Data Productions and Subsequent Work to Ready the Data for Analysis and Claims Administration...................................... 26

        2.    Lead Counsel's Negotiations over the Scope of Defendants' Document Productions ................................................................. 29

    I.    Class Plaintiffs' Document Productions ............................................. 32

    J.    Discovery Propounded on Non-Parties.............................................. 33

    K.    Lead Counsel's Review of Discovery and Settlement Cooperation Materials ........................................................................... 34

    L.    Deposition Discovery..................................................................... 36

    M.    Lead Counsel Develop the Plan of Distribution ................................... 39

    N.    Other Significant Efforts Made by Lead Counsel................................. 40

IV.    LEAD COUNSEL'S MEDIATION EFFORTS RESULTING IN THE SETTLEMENTS AND PRELIMINARY APPROVAL OF THE SETTLEMENT AGREEMENTS...................................................................... 41

A.      Overview of the Mediations.................................................................. 41

B.      Negotiations Resulting in the First Wave of Nine Settlements ........... 43

        1.      JPMorgan........................................................................... 43

        2.      UBS .................................................................................... 45

        3.      Citigroup............................................................................ 48

        4.      Barclays ............................................................................. 49

        5.      Bank of America ................................................................ 51

        6.      Goldman Sachs .................................................................. 52

        7.      RBS .................................................................................... 53

        8.      BNP Paribas ...................................................................... 54

        9.      HSBC.................................................................................. 55

        10.     Multilateral Negotiations ................................................. 56

        11.     Preliminary Approval ....................................................... 57

C.      Negotiations Resulting in the Second Wave of Five Settlements........ 58

        1.      BTMU ................................................................................. 58

        2.      Morgan Stanley ................................................................. 59

        3.      RBC .................................................................................... 59

        4.      Soc Gen .............................................................................. 60

        5.      Standard Chartered ........................................................... 61

        6.      Preliminary Approval ....................................................... 62

D.      Negotiations Resulting in Deutsche Bank Settlement and
        Preliminary Approval................................................................. 62

E.      Motions to Approve the Form and Manner of Notice and
        Preliminary Approval of the Plan of Distribution.................................. 63

V.      LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS'
        FEES AND REIMBURSEMENT OF EXPENSES ......................................... 65

VI.     SUMMARY OF GLOBAL REGULATORY AND ENFORCEMENT ACTIONS........ 72

VII.    EXHIBITS .................................................................................................. 79

VIII.   CONCLUSION............................................................................................ 81

Pursuant to 28 U.S.C. §1746, we, Christopher M. Burke and Michael D. Hausfeld, declare:

1.      We are, respectively, partners of the law firms of Scott+Scott, Attorneys at Law, LLP ("Scott+Scott") and Hausfeld LLP ("Hausfeld," and together with Scott+Scott, "Lead Counsel").  By Orders dated February 13, 2014, March 4, 2014, and August 13, 2015, the Court appointed Scott+Scott and Hausfeld as interim co-lead counsel for the putative U.S. class and exchange-traded class in the above-captioned action (the "Action").  ECF Nos. 96, 145, 412, 421.  By Orders dated December 15, 2015, September 8, 2017, and September 29, 2017, the Court appointed us as settlement class counsel for the Settlement Classes.  ECF Nos. 536, 866, 882.  We have been actively involved in prosecuting and resolving this Action, are familiar with its proceedings, and have personal knowledge of the matters set forth herein.  If called upon and sworn as witnesses, we could competently testify thereto.

2.      Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement with Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Bank of America Stipulation"); Stipulation and Agreement of Settlement with Barclays Bank PLC and Barclays Capital Inc. ("Barclays Stipulation"); Stipulation and Agreement of Settlement with BNP Paribas Group, BNP Paribas North America Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc. ("BNP Paribas Stipulation"); Stipulation and Agreement of Settlement with Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc. ("Citigroup Stipulation"); Stipulation and Agreement of Settlement with The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. ("Goldman Sachs Stipulation"); Stipulation and Agreement of Settlement with HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. ("HSBC Stipulation"); Stipulation and Amended

Agreement of Settlement with JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. ("JPMorgan Amended Stipulation"); Stipulation and Agreement of Settlement with The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc. ("RBS Stipulation"); Stipulation and Amended Agreement of Settlement with UBS AG, UBS Group AG, and UBS Securities LLC ("UBS Amended Stipulation"); Stipulation and Agreement of Settlement with The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU Stipulation"); Stipulation and Agreement of Settlement with Morgan Stanley, Morgan Stanley & Co., LLC, and Morgan Stanley & Co. International plc ("Morgan Stanley Stipulation"); Stipulation and Agreement of Settlement with RBC Capital Markets, LLC ("RBC Stipulation"); Stipulation and Agreement of Settlement with Société Générale ("Soc Gen Stipulation"); Stipulation and Agreement of Settlement with Standard Chartered Bank ("Standard Chartered Stipulation"); and Stipulation and Agreement of Settlement with Deutsche Bank AG ("Deutsche Bank Stipulation").

3.    The foregoing Stipulations are collectively referred to as the "Settlement Agreements," and the foregoing defendants are collectively referred to as the "Settling Defendants."  In this Declaration, citations to specific paragraphs of the Settlement Agreements will be made with the citation form "Stips.," where the paragraph numbers are the same across the agreements.  To the extent any paragraph numbers differ between Settlement Agreements, this Declaration will cite to the individual agreements.

4.    Unless otherwise specified "Plaintiffs' Counsel" as used herein includes the Lead Counsel firms, as well as the other Plaintiffs' Counsel firms, who at Lead Counsel's direction, assisted Lead Counsel in the prosecution of the Action.  Attached hereto as Exhibits 2 through 33 are Declarations from each Plaintiffs' Counsel firm, attesting to the hours spent and litigation expenses incurred in the prosecution of the Action.

5.      We respectfully submit this Declaration in support of Class Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the Settlement Agreements between Class Plaintiffs and Settling Defendants.  We also respectfully submit this Declaration in support of:  (i) approval of the proposed plan for allocating the proceeds of the settlements to eligible class members (the "Plan of Distribution"); and (ii) Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application").

6.      For the reasons set forth below and in the accompanying memoranda of law,[1] we respectfully submit that:  (i) the terms of the Settlement Agreements are fair, reasonable, and adequate in all respects and should be approved; (ii) the Plan of Distribution is fair and reasonable and should be approved; and (iii) the Fee and Expense Application is reasonable, supported by the facts and law, and should be granted in all respects.

7.      Because this Declaration is submitted in support of settlement, it is inadmissible in any subsequent proceedings.

## I.    INTRODUCTION

8.      If approved, the Settlement Agreements, providing for, among other things, $2,310,275,000 in cash payments (the "Settlement Fund") and each Settling Defendant's agreement to provide extensive cooperation, will resolve the Action against Settling Defendants. The settlement amount, including any funds paid for the purposes of contributing to notice and administration costs, agreed to by each Settling Defendant is:

---

[1] In addition to this Declaration, Class Plaintiffs and Lead Counsel are submitting the: (i) Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Fifteen Settlement Agreements (the "Settlement Memorandum") and (ii) Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum").

| Settling Defendant | Amount |
|---|---|
| BTMU | $10,500,000 |
| Bank of America | $187,500,000 |
| Barclays | $384,000,000 |
| BNP Paribas | $115,000,000 |
| Citigroup | $402,000,000 |
| Deutsche Bank | $190,000,000 |
| Goldman Sachs | $135,000,000 |
| HSBC | $285,000,000 |
| JPMorgan | $104,500,000 |
| Morgan Stanley | $50,000,000 |
| RBC | $15,500,000 |
| RBS | $255,000,000 |
| Soc Gen | $18,000,000 |
| Standard Chartered | $17,200,000 |
| UBS | $141,075,000 |
| **Total Settlements** | **$2,310,275,000** |

9.      The Settlement Agreements provide an immediate cash benefit to the Settlement Classes while avoiding the substantial risk, expense, and delay of taking this Action to trial against Settling Defendants, including the risk that the Settlement Classes would recover less than the amount of the Settlement Fund at trial, or nothing at all, after many additional years of litigation.

10.      The Settlement Agreements also provide for each Settling Defendant's cooperation in the continuing prosecution of the Action.  As such, the Settlement Classes receive the benefit of access to cooperation in pursuing their claims against Credit Suisse AG, Credit Suisse Group AG, and Credit Suisse Securities (USA) LLC ("Credit Suisse," and together with Settling Defendants, the "Defendants"), the only remaining non-settling defendant in the Action. As described in detail below, this has proved to be highly valuable consideration.

11.     The $2,310,275,000 Settlement Fund represents a 23% to 29% recovery measured against Class Plaintiffs' estimated range of aggregate damages of $8 billion to $10 billion for the entire Settlement Class Period before trebling.  Factoring in the shortened litigation class period following the Court's decision on the motion to dismiss the Second Consolidated Amended Class Action Complaint, and corresponding decrease in damages, the Settlement Fund represents an estimated recovery of approximately 33% to 43% of aggregate damages before trebling, assuming a 100% claims rate.  If, instead, there is a 50% claims rate by volume, Settlement Class Members who make a valid claim will realize approximately 66% to 86% of single damages they could have obtained through trial.  This is an extraordinary result.  Additionally, these 15 Settlements represent a partial settlement, while the case proceeds against the remaining defendant, Credit Suisse.  Settlement Class Members could recover additional funds in the future, as the Settlement Agreements do not prejudice the Settlement Classes' ability to recover treble damages with respect to the entire conspiracy from Credit Suisse (subject to setoff).

12.     The Settlement Agreements were the product of arm's-length negotiations among experienced counsel, facilitated by one of the country's foremost mediators of complex actions, Kenneth R. Feinberg.  Moreover, Class Plaintiffs and Lead Counsel had a thorough understanding of the relative strengths and weaknesses of the claims asserted in the Action at the time they reached each of the Settlement Agreements.

13.     For each of these reasons, and those set forth below, we believe that the Settlement Agreements constitute an outstanding result for the Settlement Classes and that they should be approved.

14.     We also believe that the Plan of Distribution should be approved.  The Plan of Distribution was developed by Lead Counsel in consultation with experts, experienced

settlement administrators, and Allocation Counsel.  It was designed to fairly and reasonably allocate the Net Settlement Fund among Authorized Claimants based on the amount of damage a claimant sustained, relative to damage sustained by other claimants.  Since the Plan of Distribution provides a fair, reasonable, and efficient method for allocating the Net Settlement Fund, it is consistent with many other distribution plans that have been approved by courts in this District and elsewhere.

15.     As to the Fee and Expense Application, the Notice informed the Settlement Classes that Lead Counsel would apply for an award of attorneys' fees and reimbursement of litigation expenses, the total of which would not exceed 18% of the Settlement Fund.  On behalf of all Plaintiffs' Counsel, Lead Counsel now move the Court to award 16.51% of the Settlement Fund (or $381,353,830.27, plus interest) as attorneys' fees, which is commensurate with counsel's collective efforts, the substantial risk they undertook, and the outstanding results they achieved.  This case is not a follow on action where Class Plaintiffs simply piggybacked on the efforts of government regulators and law enforcement.  Class Plaintiffs could not rely on the fruits of the U.S. Department of Justice ("DOJ") investigation or other regulatory and enforcement actions to prove any element of their claims.  When the original complaint was filed in November 2013, news reports disclosed government investigations of bank conduct in the foreign exchange ("FX") market, but no regulator or agency had concluded its investigation, and there was no guarantee that government action would be taken.  Further, as far as Lead Counsel are aware, six of the Settling Defendants that will pay a combined $246.2 million were never fined by any government agency.

16.     In order to prove their claims, Lead Counsel deployed the talents and resources of Plaintiffs' Counsel, ensuring that sufficient attorney resources were dedicated to prosecuting the

Action, in particular, to conducting voluminous discovery. In total, Plaintiffs' Counsel devoted 330,600.98 hours to prosecuting this Action.

17. Lead Counsel also move for reimbursement of $22,495,669.73 in litigation expenses (0.97% of the Settlement Fund) reasonably and necessarily incurred in the prosecution of the Action. Preparing to prove liability, class-wide impact, and damages also required locating and engaging highly skilled and specialized FX market experts, FX scholars, finance experts, industrial organization economists, and other subject matter experts. Engagement of these experts was necessary and indispensable to Class Plaintiffs' prosecution of the Action. Settling Defendants would not have entered into such high-value settlements without Lead Counsel being able to demonstrate a methodology that could prove a persistent pattern of unlawful conduct, class-wide impact, and damages, and claims administration would not be possible without the experts' work on the transaction data produced in this Action. The expert work in this case required the investment of thousands of hours of time and millions of dollars in hard costs. It was necessary to the prosecution of the case and was fair and reasonable in amount. Accordingly, the expert expenses, like the other litigation expenses detailed herein, should be reimbursed.

18. This Declaration sets forth in detail how Class Plaintiffs and Lead Counsel, together with Plaintiffs' Counsel, litigated and negotiated what is collectively the third largest antitrust class action settlement in the history of the Sherman Act. This Declaration is organized as follows: (i) Section II provides an overview of the facts giving rise to the Action; (ii) Section III discusses Class Plaintiffs' prosecution of the Action; (iii) Section IV sets forth the details concerning the mediations and negotiation processes that led to the Settlement Agreements; (iv) Section V addresses Lead Counsel's Fee and Expense Application; (v) Section VI provides a

description of the government regulatory and enforcement actions that have proceeded in parallel

with the Action; and (vi) Section VII lists the Exhibits attached to this Declaration.

## II.    FACTUAL BACKGROUND

19.    In the Third Consolidated Amended Class Action Complaint ("TAC") (ECF No.

619), Class Plaintiffs allege that Defendants conspired to fix prices in the FX market in violation

of Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1, 3, and that Defendants

manipulated the FX market in violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.*

("CEA").  Class Plaintiffs allege that Defendants carried out collusive and manipulative conduct

in the FX market as part of a single, continuous conspiracy effected through multiple devices.

20.    Class Plaintiffs allege that Defendants conspired to fix the bid-ask spreads that

Defendants quoted to class members.  The bid-ask spread is the difference between the rate at

which a Defendant indicated it would buy a currency and the rate at which a Defendant indicated

it would sell a currency.  Class Plaintiffs allege that Defendants discussed and agreed to fix bid-

ask spreads, primarily through communications in electronic chat rooms, but also by other forms

of communication.  Class Plaintiffs allege that the conspiracy to fix bid-ask spreads reduced

competition in the FX market and artificially increased bid-ask spreads, with the result that class

members paid more for currencies they purchased and received less for currencies they sold than

they would have in a competitive market.

21.    Another conspiratorial device alleged in the TAC involved fixing and

manipulating "FX Benchmark Rates," which are rates that are published at certain times during

the day.  FX Benchmark Rates are prices at which Defendants offered to transact, and did

transact, with class members.  The most widely used of the FX Benchmark Rates were the

WM/Reuters Closing Spot Rates, which for the most widely traded currency pairs, were set

around 4:00 p.m. London time, using median prices of actual trades done in the market on

certain venues between 3:59:30 p.m. and 4:00:30 p.m. London time. As with bid-ask spreads, Class Plaintiffs allege that Defendants shared confidential order and trade information to collude with respect to their trading positions and trading strategies to fix the FX Benchmark Rates. Such collusive trading strategies included front-running, "banging the close" (*i.e.*, breaking up large orders into small trades immediately before and during the setting of FX Benchmark Rates), and other tactics. Class Plaintiffs allege that this conduct was carried out primarily through communications in chat rooms.

22. Other alleged conspiratorial devices used to fix prices in the FX market included triggering clients' stop loss and limit orders, working client limit orders at levels better than the limit order price, and front-running orders throughout the trading day.

23. As a result of such multi-faceted conduct carried out as part of a single conspiracy, Class Plaintiffs allege that class members paid supra-competitive prices for FX Instruments and FX Exchange-Traded Instruments.

## III. CLASS PLAINTIFFS' PROSECUTION OF THE ACTION

24. Plaintiffs' Counsel spent more than 330,000 hours prosecuting the Action, through and including December 31, 2017, for a total lodestar of $174,041,760.50. As explained further below, the time Plaintiffs' Counsel spent prosecuting the Action included, among other things:

- investigating the facts and legal theories that formed the basis for the allegations, including reviewing publicly-available information and news articles, interviewing FX market participants and traders, and consulting with economic and financial experts to identify economic and statistical evidence of collusion and manipulation in the FX market;

- drafting the original complaint and three detailed consolidated amended complaints;

- prosecuting and defending numerous motions, including successfully opposing Defendants' three motions to dismiss pursuant to Rules 12(b)(2) and 12(b)(6);

- engaging in extensive discovery and settlement negotiations, as well as numerous meet-and-confer discussions, resulting in Defendants' production of approximately 1.6 million documents, amounting to more than 16.5 million printable pages;

- reviewing nearly all documents produced to date, including transcripts from approximately 500 individual chat rooms, as well as listening to over 36,000 audio files;

- obtaining approximately 6.25 terabytes of transaction data from Defendants and non-parties (including Thomson Reuters, Hot Spot, and EBS), which required conducting over 100 meet and confers, analyzing data samples, reviewing the data produced, and remedying deficiencies;

- collecting, reviewing, and then producing approximately 114,000 documents, amounting to a total of over 1.9 million printable pages, on behalf of Class Plaintiffs and defending their depositions;

- preparing for the depositions of Defendants' current and former employees, including negotiating with DOJ and counsel for Defendants, document review, drafting deposition outlines, and requesting assistance under the Hague Convention on the Taking of Evidence Abroad to obtain permission to take depositions of witnesses located outside the United States;

- engaging in more than 20 in-person mediation sessions overseen by Mr. Feinberg, as well as participating in a plethora of follow-up telephonic mediation sessions and negotiations;

- negotiating and drafting the Settlement Agreements and exhibits thereto, including resolving various issues, such as the extent and timing of the cooperation provisions, the settlement class definition, and the scope of the release, and after execution, briefing and arguing multiple motions for preliminary approval;

- developing a fair and reasonable Plan of Distribution, in consultation with Mr. Feinberg, experts, and Allocation Counsel, and briefing and arguing multiple motions for preliminary approval of the plan; and

- consulting extensively with experts on numerous other aspects of the case investigation and complaints, mediation, class certification, and merits issues.

### A. Consolidation and Appointment of Lead Counsel

25.    Scott+Scott, Korein Tillery, and MoginRubin started investigating bank conduct in the FX market beginning in the summer of 2013, following publication of a Bloomberg article

indicating possible misconduct in the FX market.[2]  As a result of this investigation, on November 1, 2013, Haverhill Retirement System filed the first case, *Haverhill Ret. Sys. v. Barclays Bank PLC*, Case No. 13-cv-7789, in what would become this consolidated Action.  The *Haverhill* complaint was based on extensive fact investigation and legal research by Scott+Scott, Korein Tillery, and MoginRubin.  This investigation included, among other things, a review of publicly available information and news articles.  The firms hired an academic and FX trader to present on the fundamentals of the FX market to the attorneys who would be prosecuting the case.  The firms also dedicated substantial time and resources to interviewing FX market participants and traders in the United States, London, and elsewhere.  In addition, the firms consulted with economic and finance experts to identify economic and statistical evidence of collusion and manipulation of the FX market.

26.    Additional complaints alleging substantially similar conduct were subsequently filed.  Prior to those actions being assigned to the Hon. Lorna G. Schofield in January 2014, in proceedings before the Hon. Edwardo Ramos and the Hon. Richard M. Berman, Scott+Scott, Korein Tillery, and MoginRubin negotiated stipulations setting the time for Defendants to move or respond to the complaints while other cases were being filed, responded to a motion to relate the *Simmtech* case (filed on behalf of a class that traded FX in the Republic of Korea), negotiated a proposed Case Management Order, and argued for the class at an initial status conference before the Hon. Richard M. Berman.

27.    Following a hearing on February 13, 2014, and pursuant to Fed. R. Civ. P. 42(a), the Court consolidated for all purposes the first-filed *Haverhill* action with Case Nos. 13-cv-

---

[2]    Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (http://bloom.bg/1qGQ3oy).

9080, 13-cv-9125, 13-cv-9237, 14-cv-350, 14-cv-475, 14-cv-494, 14-cv-752, 14-cv-787, 14-cv-825, 14-cv-867, 14-cv-876, and 14-cv-902 (as member cases), directed the Clerk to close the later-filed cases, and amended the caption of the consolidated Action to "*In re Foreign Exchange Benchmark Rates Antitrust Litigation.*"  ECF No. 96.

28.    After hearing contested motions for appointment of interim lead counsel pursuant to Rule 23(g)(3), the Court appointed Scott+Scott and Hausfeld to serve as interim co-lead counsel for the class.  ECF Nos. 96, 145.  The Court appointed Scott+Scott and Hausfeld as interim co-lead counsel based on their work in identifying and investigating the claims in the Action, experience in handling class actions and antitrust claims, knowledge of the applicable law, the resources that they had committed (and would commit) to the case, including overseas resources, and the efficiencies presented by the two firms prosecuting the Action in conjunction with other firms on an as-needed basis.  *See* Hrg. Tr. at 43-44 (Feb. 13, 2014).

### B. Lead Counsel Continue to Investigate Claims and File the Consolidated Amended Class Action Complaint

29.    The investigative efforts of Lead Counsel, and designated Plaintiffs' Counsel working at our direction, continued after the filing of the *Haverhill* complaint and consolidation of the Action.  Lead Counsel continued to analyze information about the FX market and engaged in an ongoing investigation to bolster Class Plaintiffs' allegations.  Media reports suggested that many regulators and enforcement agencies, both in the United States and abroad, had commenced investigations into conduct in the FX market, including the conduct of certain Defendants.  Accordingly, Lead Counsel's efforts during this time consisted of a detailed review of public reports discussing those investigations.  In addition, many of the Defendants had terminated and/or suspended FX traders; other FX traders left the Defendants' employ to retire or to take other positions.  The media widely reported on these employment changes, and Lead

Counsel tracked these reports and investigated this conduct. Lead Counsel, and designated Plaintiffs' Counsel working at our direction, continued to interview FX market participants and traders and to consult with experts to identify economic and statistical evidence of collusion and manipulation of the FX market.

30.    The Court ordered Lead Counsel to file a consolidated complaint by March 31, 2014. ECF No. 96. Lead Counsel vetted the various plaintiffs that had filed member cases as a part of the consolidation process. Lead Counsel also interviewed experts and analyzed written materials that had been developed by various Plaintiffs' Counsel for potential use in the consolidated complaint. On March 31, 2014, certain of the Class Plaintiffs filed the 66-page Consolidated Amended Class Action Complaint ("CAC"),[3] alleging that Defendants[4] conspired to fix prices in the FX market in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§1, 3. ECF No. 172. The CAC alleged, among other things, that before the calculation of the WM/Reuters Closing Spot Rates at 4 p.m. London time, Defendants communicated in chat rooms, shared non-public price information about customers' orders and their net trading positions, and agreed to engage in collusive trading strategies to fix the rates. The CAC further alleged that, as a result, Defendants were able to move the rates in directions favorable to their

---

[3]    The Class Plaintiffs who brought the CAC were Aureus Currency Fund, L.P., City of Philadelphia, Board of Pensions and Retirement, Employees' Retirement System of the Government of the Virgin Islands, Employees' Retirement System of Puerto Rico Electric Power Authority, Fresno County Employees' Retirement Association, Haverhill Retirement System, Oklahoma Firefighters Pension and Retirement System, State-Boston Retirement System, Syena Global Emerging Markets Fund, LP, Tiberius OC Fund, Ltd., Value Recovery Fund L.L.C., and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund. As further described below, in addition to those Class Plaintiffs already named in the CAC, additional Class Plaintiffs were named in the Second Consolidated Amended Class Action Complaint ("SAC").

[4]    The Defendants named in the CAC were Bank of America, Barclays, BNP Paribas, Citigroup, Goldman Sachs, HSBC, JPMorgan, RBS, UBS, Morgan Stanley, Deutsche Bank, and Credit Suisse. As further described below, additional defendants were named in the SAC.

trading positions, thereby allowing Defendants to obtain profits at the expense of, and resulting in harm to, class members.

### C. Class Plaintiffs Oppose Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint

31.     On May 30, 2014, Defendants jointly moved to dismiss the CAC pursuant to Rule 12(b)(6).   ECF No. 208.   The briefing included a 40-page memorandum of law.   In their submissions, Defendants argued, among other things, that the CAC failed to adequately allege (i) an agreement in restraint of trade; (ii) injury-in-fact; (iii) harm to competition; (iv) antitrust standing; and (v) that Class Plaintiffs' claims were time-barred by the statute of limitations. Class Plaintiffs filed their 40-page memorandum of law in opposition on July 29, 2014.  ECF No. 213.  On August 28, 2014, Defendants filed a reply memorandum.  ECF No. 214.

32.     After Defendants filed their reply, Lead Counsel prepared for oral argument by, among other things: (i) reviewing and analyzing Defendants' briefing; (ii) conducting additional legal research regarding issues raised in Defendants' reply brief; (iii) outlining and drafting an oral presentation; (iv) engaging in strategic discussions; (v) doing mock arguments; and (vi) continuing factual investigation, including analysis of information about regulatory investigations.

33.     On November 12, 2014, the Commodity Trading Futures Commission ("CFTC") Office of the Comptroller of the Currency ("OCC"), U.K. Financial Conduct Authority ("U.K. FCA"), and Switzerland's competition regulator ("FINMA") imposed civil penalties on various Defendants, including Bank of America Citigroup, HSBC, JPMorgan, RBS, and UBS.   The Court took judicial notice of these penalties pursuant to Federal Rule of Evidence 201.   *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 589 n.4 (S.D.N.Y. 2015) ("*FX I*").

34.     The Court heard oral argument on Defendants' motion to dismiss on November 20, 2014.  ECF No. 220.  Following the argument, certain Defendants submitted additional arguments on antitrust standing and injury-in-fact.  ECF No. 224.  Class Plaintiffs submitted a response in opposition.  ECF No. 225.

35.     On January 28, 2015, the Court issued an Opinion and Order denying Defendants' motion to dismiss.  ECF No. 242; *see also FX I*, 74 F. Supp. 3d 581.  Specifically, the Court rejected Defendants' arguments on all five grounds identified above.

**D.  Lead Counsel Negotiate for Settlement Cooperation, Move to Consolidate Exchange Cases, and File the Second Amended Consolidated Class Action Complaint**

36.     Just prior to the Court's decision on the motion to dismiss, on January 5, 2015, Class Plaintiffs executed a settlement agreement settling claims against JPMorgan (the "JPMorgan Stipulation") and so-informed the Court.  The JPMorgan Stipulation provided for extensive settlement cooperation.  However, shortly following execution of the JPMorgan Stipulation, on February 17, 2015, DOJ requested a blanket six-month discovery stay, which would have prohibited all forms of discovery and settlement cooperation.  ECF No. 266.

37.     In response, Lead Counsel sought to narrow DOJ's requested stay in order to permit Lead Counsel to pursue certain types of information through settlement cooperation and agreements with certain Defendants as part of settlement discussions with them.  ECF No. 268. After further negotiations between DOJ and Lead Counsel, DOJ submitted a letter to the Court that outlined the terms of its proposed six-month discovery stay – which, importantly, included exceptions for Class Plaintiffs to obtain transaction data and attorney proffers on certain subjects from Settling Defendants.  The Court endorsed the proposal.  ECF No. 274.

38.     In February, April, and June of 2015, additional cases, accepted by the Court as related to the Action, were filed on behalf of classes of persons who traded FX futures and/or

options on exchanges (*Taylor v. Bank of America Corp.*, Case No. 15-cv-1350 (S.D.N.Y. Feb. 23, 2015); *Sterk v. Bank of America Corp.*, Case No. 15-cv-2705 (S.D.N.Y. April 7, 2015); *Bakizada v. Bank of America Corp.*, Case No. 15-cv-4230 (S.D.N.Y. June 2, 2015); *Teel v. Bank of America Corp.*, Case No. 15-cv-4436 (S.D.N.Y. June 9, 2015); and *Robert Charles Class A., L.P. v. Bank of America Corp.*, Case No. 15-cv-4926 (S.D.N.Y. June 24, 2015) (collectively, the "Exchange Actions")).

39.    On June 12, 2015, Class Plaintiffs filed a pre-motion conference letter seeking leave to file a motion to file the Second Consolidated Amended Class Action Complaint ("SAC").   ECF No. 297.   The proposed amendments were based on settlement cooperation obtained from early Settling Defendants, including UBS (which was DOJ's amnesty applicant) and JPMorgan, further investigation by Lead Counsel, and public disclosure of additional conduct (*e.g.*, additional news reports, guilty pleas obtained by DOJ in May 2015, and additional disclosures by regulators).   The proposed SAC alleged not only a conspiracy to fix FX prices with respect to the WM/Reuters Closing Spot Rates but also a broader conspiracy to fix prices on multiple currency pairs (including bid-ask spreads) throughout the trading days during the class period.   It also added four defendants[5] and corporate affiliates of previously named defendants.[6] The proposed complaint named additional plaintiffs[7] and contained new claims under the CEA.

---

[5]    The additional defendants named in the SAC were The Bank of Tokyo Mitsubishi UFJ Ltd.; RBC Capital Markets LLC; Société Générale S.A.; and Standard Chartered plc.

[6]    The additional corporate affiliates of previously named defendants in the SAC were BNP Paribas Securities Corp.; BNP Prime Brokerage Inc.; Citicorp; Citigroup Global Markets Inc.; Credit Suisse AG; Deutsche Bank Securities Inc.; HSBC Securities (USA) LLC; Merrill Lynch, Pierce, Fenner & Smith; Morgan Stanley & Co. LLC; Morgan Stanley & Co. International plc; and UBS Group AG.

[7]    The additional named plaintiffs in the SAC were Systrax Corporation, J. Paul Antonello, Marc G. Federighi, Thomas Gramatis, Doug Harvey, Izee Trading Company, John Kerstein,

40.    On June 12 and June 18, 2015, Class Plaintiffs filed letters proposing that the Exchange Actions be consolidated with this Action and that Lead Counsel be appointed to represent the exchange class as interim lead counsel pursuant to Rule 23(g)(3).  ECF Nos. 296, 309, 310.

41.    Other parties filed letters stating their positions on consolidation and Class Plaintiffs' request for leave to file the SAC.  Collectively, these submissions were over 100 pages and included an expert report.  *See* ECF Nos. 304 (Credit Suisse, Deutsche Bank, and Morgan Stanley); ECF No. 305 (Sterk); ECF No. 306 (Bakizada); ECF No. 307 (Allen); ECF No. 308 (JPMorgan, Bank of America, Barclays, Citigroup, Goldman Sachs, HSBC, RBS, and UBS); ECF No. 311 (Taylor); ECF No. 312 (Taylor); ECF No. 314 (Teel); ECF No. 313 (Teel); ECF No. 315 (Bakizada); ECF No. 318 (Credit Suisse, Deutsche Bank, and Morgan Stanley); ECF No. 319 (Taylor); ECF No. 320 (Taylor); ECF No. 323 (Bakizada); and ECF No. 325 (Bakizada).  On June 23, 2015, Class Plaintiffs responded to these submissions in a 5-page letter. ECF No. 324.

42.    Following these submissions, Lead Counsel prepared for oral argument by, among other things:  (i) reviewing and analyzing the positions of all parties; (ii) conducting additional legal research regarding issues raised in the submissions; (iii) outlining and drafting an oral presentation; (iv) discussing strategy; and (v) discussing consolidation with counsel in the Exchange Actions.

43.    On June 25, 2015, the Court held a pre-motion conference on Class Plaintiffs' motion for leave to file the SAC and on consolidation.  At the conference, the Court granted

---

Michael Melissinos, Mark Miller, Robert Miller, Richard Preschern d/b/a Preschern Trading, Peter Rives, Michael J. Smith, Jeffrey Sterk, and Kimberly Sterk.

Class Plaintiffs' motion to file the SAC. ECF No. 332. The Court also set a briefing schedule on Class Plaintiffs' motion to consolidate and appoint interim lead counsel in the Exchange Actions. ECF No. 331.

44.    On July 16, 2015, Class Plaintiffs filed the 200-page SAC under seal. Because the SAC contained settlement cooperation information obtained by Class Plaintiffs from certain of the Settling Defendants, and such information could implicate DOJ's ongoing criminal investigation, Class Plaintiffs conferred with DOJ regarding sealing portions of the SAC. *See* ECF No. 365. DOJ agreed to Class Plaintiffs' proposed redactions, the Court allowed the redactions, and on July 31, 2015, Class Plaintiffs filed a redacted, public version of the SAC . ECF No. 368. Class Plaintiffs removed additional redactions in a second public version of the SAC filed on September 21, 2015. ECF No. 465.

45.    On July 16, 2015, Class Plaintiffs filed their motion to consolidate the Exchange Actions and to appoint Lead Counsel pursuant to Rule 23(g)(3). ECF No. 347. Six responses were filed on August 6, 2015. ECF No. 380 (Sterk); ECF No. 381 (Defendants); ECF No. 382 (Allen); ECF No. 383 (Bakizada); ECF Nos. 388 (Taylor); ECF No. 389 (Teel, Robert Charles L.P.). Class Plaintiffs filed a reply on August 12, 2015. ECF No. 397.

46.    Following these submissions, Lead Counsel prepared for oral argument by, among other things: (i) reviewing and analyzing the positions of all parties; (ii) conducting additional legal research regarding issues raised in the submissions; (iii) outlining and drafting an oral presentation; (iv) discussing strategy; and (v) discussing consolidation with counsel in the Exchange Actions. Lead Counsel worked with the counsel in the Exchange Actions to devise a structure that would allow the efficient prosecution of the matter while safeguarding the interests of all class members. Lead Counsel believed that bringing separate over the counter ("OTC")

and Exchange Actions was not in the best interests of the classes, particularly given the overlap

between the OTC and exchange classes.  All of the parties ultimately shared this view.

47.    On August 13, 2015, the Court held a hearing on Class Plaintiffs' motion to

consolidate the Exchange Actions and to appoint interim lead counsel.  With the consent of all

parties, the Court granted the motion.  ECF Nos. 412, 421.

**E.    Class Plaintiffs Oppose Defendants' Motion to Dismiss the Second
Consolidated Amended Class Action Complaint Pursuant to Rule 12(b)(2)
and Lead Counsel File a Third Consolidated Amended Class Action
Complaint to Cure Defects**

48.    On November 23, 2015, Defendants BTMU, Standard Chartered PLC, and Soc

Gen moved to dismiss the SAC pursuant to Rule 12(b)(2) for lack of personal jurisdiction.  ECF

No. 501.  The briefing consisted of a 25-page memorandum of law and three declarations.  Class

Plaintiffs filed a 25-page memorandum in opposition (ECF No. 550), and BTMU, Standard

Chartered PLC, and Soc Gen filed a reply of 15 pages (ECF No. 556).  No oral argument on the

motion was held.

49.    The Court denied the Rule 12(b)(2) motion as to BTMU and Soc Gen, but granted

the motion as to Standard Chartered PLC, while allowing Plaintiffs to seek leave to amend with

respect to Standard Chartered PLC.  ECF No. 582; *see also In re Foreign Exchange Benchmark

Rates Antitrust Litig.*, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ("*FX II*").

50.    The Court granted Plaintiffs' motion to file a Third Consolidated Amended Class

Action Complaint ("TAC"), which was in all parts identical to the SAC except that it replaced

the entity Standard Chartered PLC with Standard Chartered.  The TAC was filed on June 3,

2016, with the same redactions as the September 21, 2015 public version of the SAC.  ECF No.

619.  Class Plaintiffs continue to submit bimonthly updates to the Court on the continuing need

for redactions in the TAC, in consultation with DOJ.  *See, e.g.*, ECF No. 893 (Nov. 1, 2017 letter).

### F.  Class Plaintiffs Oppose Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint Pursuant to Rule 12(b)(6)

51.     Also in November 2015, BTMU, Standard Chartered, RBS, Soc Gen, Morgan Stanley, Deutsche Bank, and Credit Suisse moved to dismiss the SAC pursuant to Rule 12(b)(6). ECF Nos. 507, 508, 509, 510, 513, 514, 515, 516, 520.  The motion consisted of a 45-page joint memorandum of law and seven separate 3-page supplemental memoranda making individual arguments as to each responding Defendant.  Defendants argued that: (i) the SAC failed to adequately plead an agreement in restraint of trade, antitrust injury, and that Class Plaintiffs who traded on exchanges were not efficient enforcers of the antitrust laws; (ii) certain claims were barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"); (iii) certain claims were time-barred by the statute of limitations; and (iv) the SAC failed to adequately plead claims under the CEA.  Class Plaintiffs filed a 65-page memorandum in opposition to the joint memorandum and a 16-page opposition to the supplemental memoranda of law (ECF Nos. 558, 559), and BTMU, Standard Chartered, RBS, Soc Gen, Morgan Stanley, Deutsche Bank, and Credit Suisse filed 30 pages in reply  (ECF Nos. 567, 568, 576, 570, 571, 572, 573, 575, 576).

52.     Following the Second Circuit's decision in *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), the parties simultaneously submitted supplemental memoranda of law on the issue of whether OTC plaintiffs were efficient enforcers of the antitrust laws.  ECF Nos. 612, 615, 616.  In their submission, Defendants claimed that *Gelboim* led "inexorably" to the dismissal of the case.  ECF No. 612.  They argued that both OTC plaintiffs and exchange plaintiffs were not efficient enforcers, given that the challenged conduct was being investigated by regulators and enforcement agencies in a number of countries.  ECF No. 612, 615.  Class

Plaintiffs opposed, arguing, among other things, that Defendants' arguments flew in the face of the long-standing dual public and private antitrust enforcement system designed to promote competition.  ECF No. 616.

53.    On September 20, 2016, the Court denied, in part, the motion to dismiss, ruling that the SAC adequately pleaded a violation of the Sherman Act and a claim for manipulation under CEA §§9(a) and 22(a) for the time period December 1, 2007 through December 31, 2013. ECF No. 661 at 42; *see also In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ("*FX III*").  The Court held that both OTC plaintiffs and Exchange plaintiffs were efficient enforcers.  The Court granted, in part, Defendants' motion to dismiss with respect to claims arising from transactions executed on foreign exchanges; claims based on transactions between U.S.-domiciled OTC plaintiffs operating outside of the United States and a foreign desk of a defendant; claims based on transactions executed before December 1, 2007; and CEA false reporting claims.

### G.  Further Discovery Stays, Case Management Orders, and Discovery Stipulations

54.    On September 14, 2015, the Court partially lifted the discovery stay to permit the parties to conduct document discovery, while providing that testamentary discovery (depositions, interrogatories, and requests for admission) would remain stayed through June 30, 2016.  ECF Nos. 463, 583.

55.    Over the following months, Lead Counsel negotiated the Stipulation and Order of Confidentiality ("Confidentiality Stipulation") regarding the handling of confidential materials. These negotiations were complicated by a number of foreign law privacy and confidentiality issues, which required consideration of issues presented by the laws of multiple foreign jurisdictions where various Defendants were either headquartered or engaged in FX trading.

Lead Counsel exchanged numerous drafts and engaged in multiple meet-and-confer discussions with Defendants over the course of many months before finally reaching agreement on a proposal that was approved by the Court on January 25, 2016.  ECF No. 555.

56.    Similarly, Lead Counsel's efforts to negotiate an electronic discovery protocol and a deposition protocol were time-consuming and complex.  After extensive meet and confers and the exchange of numerous drafts, the parties were able to reach agreement.  The Court approved the Stipulation and Order Establishing the Protocol for the Production of Documents and Electronically Stored Information on January 17, 2017.  ECF No. 712.  The Court approved the Stipulation and Order Regarding Deposition Protocol on January 30, 2017.  ECF No. 721.

57.    Despite reaching agreement on discovery protocols, obtaining relevant documents and transaction data from certain Defendants proved problematic.  Accordingly, on July 8, 2016, Lead Counsel filed a letter motion, seeking to compel Deutsche Bank, Morgan Stanley, Credit Suisse, Standard Chartered, Soc Gen, BTMU, and RBC to produce previously requested documents and transaction data.    ECF No. 633.    In response, the Court scheduled a teleconference and ordered the parties to continue to meet and confer.  ECF No. 636.  The Court's actions proved effective in assisting Lead Counsel's discovery efforts, as the parties eventually reached an agreement under which these Defendants agreed to produce documents that they had previously produced to U.S. regulators and certain sample data (ECF No. 639), and further agreed to produce additional documents and data in accordance with a proposed case management plan that Lead Counsel and Defendants (after more than a month of negotiations) jointly submitted to the Court on December 22, 2016.  ECF No. 703.

58.    On December 23, 2016, the Court entered the Civil Case Management Plan and Scheduling Order ("CMO").  ECF No. 704.  With respect to discovery, the CMO set production

deadlines for documents and transaction data and continued the testamentary discovery stay through April 30, 2017. The CMO provided that depositions would be stayed, except that depositions of Class Plaintiffs and limited Rule 30(b)(6) depositions of Defendants on authorized topics, such as corporate organization and structure, could proceed. The CMO also set a briefing and expert discovery schedule for the class certification motion.

59.     On August 23, 2017, DOJ moved to extend the testamentary stay, which Class Plaintiffs opposed. ECF Nos. 847, 848, 852. The Court extended the testamentary stay through December 8, 2017, except that limited Rule 30(b)(6) of depositions could continue to proceed and Rule 30(b)(1) depositions of certain former and current employees of Defendants could begin. Depositions of former and current employees of the following Defendants remained stayed: Citigroup, JPMorgan, Barclays, RBS, UBS, BNP Paribas, and HSBC. ECF No. 863. Each of those Defendants and certain of their former employees have been subject to numerous regulatory and law enforcement investigations and, in the case of Mark Johnson, formerly of HSBC, a guilty verdict on eight of nine counts of wire fraud and wire fraud conspiracy. *See* Jury Verdict, *United States v. Johnson*, No. 1:16-cr-00457-NGG, ECF No. 192 (E.D.N.Y. Oct. 23, 2017).

60.     On November 27, 2017, Class Plaintiffs and Credit Suisse jointly moved to amend the CMO, given the continuation of the testamentary discovery stay, which had prohibited Class Plaintiffs from taking key depositions, as described above, and given that the parties were expecting to finish document discovery relating to the class certification phase by the end of the year. ECF No. 900. Following a hearing on December 6, 2017, the Court entered the Amended Civil Case Management Plan and Scheduling Order ("Amended CMO"). ECF No.

906.  The Amended CMO sets out the current discovery schedule as well as the briefing and expert discovery schedule for Class Plaintiffs' class certification motion.

61.    On December 8, 2017, DOJ moved to extend the testamentary stay by three months.  ECF No. 907.  The Court granted the motion, and the testamentary stay remains in place through at least March 8, 2018.  ECF No. 913.  DOJ has indicated to Lead Counsel that it is likely to seek a further extension of the stay in light of its continuing criminal investigations.

### H.  Class Plaintiffs' Discovery and Settlement Cooperation Efforts Result in Defendants' Production of Transaction Data and Documents

62.    Throughout the course of discovery and settlement cooperation, Lead Counsel, with the assistance of designated Plaintiffs' Counsel, developed considerable evidentiary support for the claims asserted in the Action.  The results achieved for the Settlement Classes would not have been possible without these efforts.  In addition to information, documents, and transaction data obtained under the cooperation provisions of the various Settlement Agreements, Class Plaintiffs have pursued all of the traditional methods of formal discovery available to them, including document requests, interrogatories, and depositions.

63.    In total, Defendants have produced approximately 1.6 million documents, amounting to more than 16.5 million printable pages.  As to transaction data, Defendants produced over 7,000 files from over 30 different trading systems, amounting to approximately 10 billion rows, occupying 4 terabytes.  Lead Counsel obtained an additional 2.5 terabytes of data from non-party sources, including Hotspot, Reuters Matching, EBS, and FX reference rates from WM/Reuters and ECB.  In fact, Lead Counsel believe the transaction database to be among the largest transaction databases ever assembled for use in a single litigation.  In addition, to date, Lead Counsel have obtained 26 attorney proffers from Settling Defendants on topics specified in the Settlement Agreements' cooperation provisions.

64.     Throughout the course of discovery and settlement cooperation, disputes arose among the parties regarding the scope of Class Plaintiffs' requests and the sufficiency of Defendants' productions and responses.  The parties were ultimately able to resolve the vast majority of their disputes.  At times, however, the settling parties required assistance from the mediator to settle disputes concerning settlement cooperation.  As to the litigating parties, Class Plaintiffs filed motions to compel in order to resolve several discovery disputes.

65.     Following the partial lifting of the discovery stay in September 2015, which allowed for documentary discovery, and following the Court's December 15, 2015 Order preliminarily approving the Settlement Agreements with Bank of America, Barclays, BNP Paribas, Citigroup, Goldman Sachs, HSBC, JPMorgan, RBS, and UBS (ECF No. 536), these Defendants produced documents and transaction data pursuant to the cooperation provisions of the Settlement Agreements.

66.     On September 18, 2015, Class Plaintiffs served the First Set of Requests for Production of transaction data on Credit Suisse, Deutsche Bank, and Morgan Stanley.  On January 12, 2016, Class Plaintiffs served the Second Set of Requests for Production of documents on these Defendants.  Following the expiration of discovery stays pending Rule 12(b)(2) motions, Class Plaintiffs served their First Set of Requests for Production of transaction data on BTMU, RBC, Soc Gen, and Standard Chartered on June 7, 2016, and their Second Set of Requests for Production of documents on these Defendants on June 8, 2016.  In drafting these requests, Lead Counsel drew from their review of settlement cooperation materials received to date and their consultations with various experts.  Credit Suisse, Deutsche Bank, Morgan Stanley, BTMU, RBC, Soc Gen, and Standard Chartered responded and objected to these requests.

67.    As described above, on July 8, 2016, Lead Counsel moved to compel Deutsche Bank, Morgan Stanley, Credit Suisse, Standard Chartered, Soc Gen, BTMU, and RBC to produce transaction data and documents responsive to these requests.  ECF No. 633.  Further negotiations led to the entry of the CMO in December 2016, which required immediate production of sample transaction data and documents produced to U.S. regulators, to the extent they had not already been produced.

### 1.  Lead Counsel's Negotiations over the Scope of Defendants' Transaction Data Productions and Subsequent Work to Ready the Data for Analysis and Claims Administration

68.    Lead Counsel's negotiations over transaction data were complex and time-consuming.  Lead Counsel, with the assistance of experts at Velador Associates, participated in over 100 separate meet and confers on the scope of data productions with counsel for Defendants and their respective experts.

69.    Lead Counsel's data negotiations generally proceeded similarly with Settling Defendants and non-settling defendants.  The process began with defense counsel identifying computer systems where potentially responsive data could be stored and, subsequently, producing sample data from those systems several months later, as it took time for the Defendants to extract sample data from various systems.  Lead Counsel and their experts analyzed the data samples, which usually consisted of one month's worth of transaction data.  Lead Counsel and their experts created a target list of approximately 35 key fields with descriptions and mapped the fields present in the data samples to the target list of fields and provided the mapping spreadsheet to defense counsel.  Lead Counsel then arranged for a call or an in-person meeting between the experts for each of the parties during which the mappings were verified and/or corrected, and, where there were key fields missing, potential alternatives from other bank systems were explored.  Class Plaintiffs and non-settling defendants entered into

stipulations that provided that any production or exchange of information between the parties' respective experts in furtherance of the fact discovery process did not constitute a waiver of any applicable privileges or protections from discovery or disclosure in the Action or in any other federal or state proceeding and that any such expert's work would remain subject to the protections of Rule 26(b)(3)(D) and any other applicable privileges or protections.

70.    In parallel, counsel for each of the parties also negotiated data production scope topics, including relevant time frame and data availability, instruments, venues (voice/electronic/exchange), geographies, and the approach for handling issues arising from application of data privacy, bank secrecy, and/or state secrecy laws impacting mainly non-U.S. domiciled class members.  Disputes between Class Plaintiffs and several Settling Defendants arose on scope topics, requiring the assistance of Mr. Feinberg to be resolved.  With respect to non-settling parties, disputes on geographic scope, time period, and venues were resolved on the eve of Class Plaintiffs filing motions to compel.

71.    After Lead Counsel obtained an agreement on the fields and scope of transaction data to be produced, it typically took another three months (or more) for a Defendant to extract, verify, and produce a full transaction data set.  After Lead Counsel received a data set, Class Plaintiffs' experts analyzed the data.  This often generated further meet and confers between the parties' experts to clarify questions relating to the data, and in some cases, additional transaction data had to be negotiated for and produced.  Many Defendants kept transaction data in multiple systems over the class period, so the mapping and negotiation process was sometimes repeated for two or three systems per Defendant.

72.    Once data was received, Lead Counsel uploaded it into a secure environment, which is further described in §V below.  The next step was for Class Plaintiffs' experts to

"clean" and "normalize" the data so that it could be standardized and combined together into a unified format, facilitating the modeling of class-wide impact and damages, as well as forming the basis for claims administration.  This extensive work was done by Velador.

73.    **Data cleaning**.  As a result of the extensive meet-and-confer process and review of sample data, Lead Counsel knew that, after production, the experts would need to take certain steps to clean the data.  Defendants generally produced their data unfiltered to include all the entries that pertained to one executed trade.  For example, extraneous lines that modified or cancelled trades had to be removed so that only one version of a trade remained.  Administrative trades including internal processes, intra branch, and settlement procedures had to be identified and removed where appropriate.  In addition, where required, Velador grouped swap trades, which was a process that entailed identifying the legs of a swap and assigning numbers to each leg of the transaction.  Time stamps had to be converted to a uniform time zone.  In some cases, client identification numbers had to be constructed where not provided.  Various other *ad hoc* bank-specific data issues had to be addressed.  This was an iterative process that took multiple meet and confers with counsel for Defendants, as described above.

74.    **Data normalization.**  Collectively, Defendants produced data from over 30 different trading systems, each with its own structure and naming conventions for data fields. After extensive data cleaning and testing, Velador normalized the data by creating uniform data extracts for each Defendant and sub-asset class (such as spot, forward, swap, and option) under a common structure.  Velador constructed the extracts in a way that would minimize the time and expense of running statistical tests and modeling programs on the data.  These extracts include key elements such as the basic economics of the transaction (date and time, price, currency pair, notional amount, and value date), identifying information (such as client identification numbers

and names), venue information (such as whether the trade was executed by voice or electronically), and geographic information (such as the location of where the trade was executed and where the client was located). In connection with data cleaning and normalization, Velador developed over 1,000 scripts of code and is currently on the 70th iteration of the unified extracts. The extracts, extraordinary in their volume, were the product of extensive, time-consuming work by Lead Counsel and their experts.

75.    Class Plaintiffs' experts have used the unified extracts to produce data analysis for the Plan of Distribution, as well as empirical testing of class-wide impact and damages models. The extracts will also be essential to the claims administration process and, in particular, will form the basis of all "Option 1" calculations, where Claimants elect to rely on the transaction data produced by Settling Defendants for purposes of their claim calculations.

### 2. Lead Counsel's Negotiations over the Scope of Defendants' Document Productions

76.    Aside from the transactional data discussed above, Plaintiffs' Counsel also obtained approximately 1.6 million documents, amounting to more than 16.5 million printable pages, from Defendants.

77.    Lead Counsel negotiated the scope of the document discovery (as distinct from data discovery) from the first nine Settling Defendants as part of negotiations over the scope of the cooperation provisions in the Settlement Agreements with those Defendants.

78.    With respect to Defendants that had not yet settled, the meet-and-confer process focused initially on obtaining copies of document productions made to U.S. regulators and meet-and-confer discussions to understand the scope of the productions, including disclosure of custodians, search terms, and hit reports. Lead Counsel, or designated Plaintiffs' Counsel, then used the documents and information as the basis for negotiations over the scope of additional

documents that each such Defendant would produce.  In particular, these discussions focused on the extent to which each such Defendant should also collect and produce: (i) documents responsive to Class Plaintiffs' additional subject matter requests (as reflected in their previously served document requests); (ii) materials from the files of additional custodians; (iii) documents involving certain types of media (notably, audio files and chat room transcripts) that U.S. regulators had not obtained from that Defendant; (iv) additional documents (including, but not limited to, email that could be identified through the use of additional search terms); and (v) documents from a longer relevant time period that began earlier and/or ended later than the time periods that the various Defendants had used when producing documents to U.S. regulators. Collectively, the parties engaged in numerous meet-and-confer discussions over the course of many months, involving exchanges of correspondence and emails that detailed the parties' respective discovery positions and documented the matters on which agreements were (or were not) reached.

79.    For example, Class Plaintiffs and Morgan Stanley held a lengthy telephonic meet and confer on December 15, 2016, after which Plaintiffs' Counsel followed up with an 8-page single-spaced letter on December 23, 2016, documenting Morgan Stanley's representations, Class Plaintiffs' additional follow-up questions, and additional documents requested.  Similarly, Class Plaintiffs and Deutsche Bank held a lengthy telephonic meet and confer on December 6, 2016, after which Lead Counsel followed up with a similar 9-page single-spaced letter on December 14, 2016.  These types of communications were typical of most of the meet and confers.

80.    By the end of the first quarter of 2017, Morgan Stanley, Standard Chartered, Soc Gen, BTMU, and RBC had moved into a settlement posture.  Nonetheless, negotiations over the

scope of discovery (including over the additional documents to be produced, proffers to be provided, and witnesses to be produced for interviews or depositions) continued in the context of settlement discussions.

81.     Extensive negotiations over document production issues with Deutsche Bank and Credit Suisse continued with respect to:  (i) the length of the relevant time period (as Class Plaintiffs were seeking documents from a longer time period than that covered by the U.S. regulatory productions); (ii) the use of additional search terms (beyond those used to identify potentially responsive documents for U.S regulators); (iii) the number of additional custodians whose files would be searched; and (iv) the production of audio files for various custodians.

82.     In February 2017, Class Plaintiffs reached an agreement with Credit Suisse on the date range issue, use of certain additional search terms to identify potentially responsive documents, and additional custodians selected by Class Plaintiffs.

83.     Lead Counsel also obtained, after motion practice (ECF No. 729), Deutsche Bank's agreement to review over a half-million additional documents (that were responsive to several hundred additional agreed-upon search terms) as part of Deutsche Bank's document production obligations.

84.     In the early spring of 2017, Class Plaintiffs, Deutsche Bank, and Credit Suisse also entered into discussions regarding the production of sample audio files.  With respect to Credit Suisse, the parties agreed that Credit Suisse would produce a sample of audio taken from the time periods for which Credit Suisse audio actually existed (2011-2013) for 10 Credit Suisse custodians.  With respect to Deutsche Bank's audio files, Deutsche Bank agreed that Class Plaintiffs would designate a sample set consisting of a total of 120 "custodian days" worth of

audiotape, from a total of 12 custodians, and which would include audio files from roughly 20 dates covering a six-year period.

85.    Due to foreign privacy law concerns, Lead Counsel were also required to request certain documents through 28 U.S.C. §1781 and Chapter I of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, March 18, 1970, T.I.A.S. No 7444, 23 U.S.T. 2555 (the "Hague Convention").  Lead Counsel used the Hague Convention to obtain documents from HSBC Bank plc.  ECF No. 722.  Lead Counsel also negotiated with counsel for Soc Gen concerning certain of its documents subject to foreign privacy issues, resulting in Soc Gen filing a Hague Convention request.  ECF No. 715.

### I.    Class Plaintiffs' Document Productions

86.    In addition to propounding discovery on Defendants, Class Plaintiffs have responded to two requests for the production of documents, consisting of a total of 54 requests with numerous subparts.  Class Plaintiffs served objections and responses, and thereafter the parties engaged in meet-and-confer discussions relating to the documents that Class Plaintiffs would search for and eventually produce.

87.    Lead Counsel coordinated the responses to Defendants' document requests with the 27 Class Plaintiffs and their counsel.  Lead Counsel: (i) prepared the initial draft responses; (ii) collected information regarding the scope of documents and information to be collected, along with comments and edits to their initial draft responses from Class Plaintiffs and Plaintiffs' Counsel; (iii) reached internal agreement on proposed edits (often after further discussions with the relevant Plaintiffs' Counsel who had proposed a given change); (iv) circulated a revised draft to all Plaintiffs' Counsel; and (v) ultimately obtained sign off from all Class Plaintiffs on the final form of the responses and objections.  Lead Counsel also chaired a small group of designated Plaintiffs' Counsel that conducted the subsequent meet and confers with relevant

Defendants' counsel over the scope of the Class Plaintiffs' objections and responses and proposed document productions in response to the document requests.

88.    In conjunction with Defendants' requests, Class Plaintiffs searched both hard copy and electronic documents.  Plaintiffs' Counsel reviewed the collected documents for privilege and responsiveness and applied confidentiality designations, created corresponding privilege logs, and provided the discovery to counsel for Defendants.  In total, Class Plaintiffs have produced 114,181 documents, amounting to a total of 1,985,393 printable pages. Additional productions are expected.  Class Plaintiffs' document productions consist of, among other things, investment manager documents, internal reports and policies, transaction data, and email communications.

### J.    Discovery Propounded on Non-Parties

89.    Plaintiffs' Counsel issued subpoenas to a number of non-parties for documents that would assist Class Plaintiffs in proving their claims.  Plaintiffs' Counsel met and conferred with each of the non-parties regarding their responses and objections, the scope of discovery, and their respective document productions.

90.    Plaintiffs' Counsel served subpoenas on the Chicago Mercantile Exchange ("CME") and Intercontinental Exchange, Inc. ("ICE") for the identification of futures commission merchants ("FCMs") and "large traders" for the purpose of providing notice to the Settlement Classes.  The CFTC regulates futures trades in the United States and, in accordance with the CEA, requires all futures contracts, including FX Exchange-Traded Instruments, traded in the United States to be executed on regulated exchanges.  Any party who transacted FX Exchange-Traded Instruments on CME and ICE had to do so through a CME or ICE clearing member.  The CFTC also requires FCMs to issue reports reflecting large traders of FX Exchange-Traded Instruments.  *See* CME Rulebook, Rule 561 (Reports of Large Positions).

Pursuant to the subpoenas, CME and ICE produced names and addresses of FCMs and large traders.

91.    Lead Counsel also subpoenaed major providers of FX data, including EBS, Thomson Reuters, and Hotspot, for production of historic FX pricing and benchmark data. These non-parties collectively produced 2.5 terabytes of data.

### K.  Lead Counsel's Review of Discovery and Settlement Cooperation Materials

92.    Plaintiffs' Counsel, working under Lead Counsel's direction, have reviewed nearly all of the 1.6 million documents produced to date, amounting to more than 16.5 million printable pages, including chat room transcripts from more than 500 individual chat rooms over thousands of trading days.  Over 36,000 audio files have also been reviewed and coded.  The audio files ranged in length from several seconds to an hour or more, totaling more than 700 hours.  As discovery is ongoing, the review teams continue to review Defendants' productions, including a recent production of over 15,000 documents from Credit Suisse and 230,000 audio files from Standard Chartered.

93.    Prior to receiving the document productions, Lead Counsel obtained bids from a number of outside vendors specializing in litigation discovery matters with respect to the costs of hosting the discovery on their electronic databases and litigation support platforms.  After evaluating the respective costs and capabilities of these vendors, Lead Counsel selected Recommind.  During the course of the review, Lead Counsel worked with Recommind to utilize its technology-assisted review ("TAR") program – the sophistication of which was one of the reasons Lead Counsel selected Recommind to host the document review in this Action.  Use of TAR allowed Lead Counsel to quickly identify documents that were likely to be more relevant to the allegations in this case and, therefore, allowed Lead Counsel to prioritize the documents for review.

94.     Prior to commencing document review, Lead Counsel, with the assistance of experts, also held formal training sessions – dubbed "FX School" – to educate the approximately 90 attorneys involved in the document review.  FX School educated attorneys about the facts of the case, litigation objectives, technical aspects of the review platform, how FX is traded, and the unique set of terms, phrases, and code words commonly used by FX traders in chat rooms.  For example, a "yard" is one billion units of currency, a "ton" is 100 million units of currency, a "bully" is 50 million, and a "mio" is one million.  "Betty" means the GBP/USD currency pair, based on a Cockney rhyming scheme, and "kiwi" is a nickname for NZD/USD.  "Big figure" refers to the first digits of a currency pair quote, and a "pip" is the last digit of the quote.  A "front book" is a trader's market-making book, which is used to record client trading and current positions, and a "back book" is a trader's proprietary trading book.  "Getting" or "get" means to buy a currency, "left hand side" or "LHS" is when a trader has orders to sell the first currency listed in a currency pair, and "right hand side" or "RHS" is when a trader is a buyer of the first currency listed in a currency pair.

95.     Following FX School, Plaintiffs' Counsel began to analyze and code documents. The document review team peaked at approximately 90 lawyers.  Lead Counsel hosted weekly, and later biweekly, telephone calls with the attorneys reviewing documents to discuss progress, interpretation of particular documents, and the development of strategies for locating the most relevant documents at various stages of the case.  Lead Counsel and the attorneys frequently exchanged emails about questions that arose during the review, and Lead Counsel often sought the assistance of experts on such questions.  In addition to the terms listed above, the attorneys have had to master many hundreds of additional vocabulary words not identified in the public record and listed above.  Accordingly, the document review in this case required great skill and

attention to detail, and Plaintiffs' Counsel firms assigned highly experienced attorneys to review the documents.  Brief bios of these attorneys are included in the accompanying Lead Counsel and Plaintiffs' Counsel Declarations attached hereto as Exhibits 2 through 33.  These attorneys' work was crucial to the outstanding results achieved to date.

96.     The attorneys assigned to the document review also drafted evidentiary memoranda that analyzed discrete factual issues, performed targeted reviews, and compiled other summary documents.  Lead Counsel's senior attorneys reviewed the resulting work, which has served (and will serve) as the basis of mediations, depositions, and substantive evidentiary discussions throughout the Action.

97.     Lead Counsel's ability to organize, educate, and supervise a review team of up to 90 attorneys to review daily chat room transcripts of 500 chat rooms over thousands of trading days reflects the high-quality representation provided to Class Plaintiffs.  The review continues as Lead Counsel prepare for the remainder of the pre-trial schedule.

### L.  Deposition Discovery

98.     Due to the pendency of DOJ's criminal investigations, depositions have largely been deferred pursuant to the testamentary stay.  Lead Counsel, however, have worked to narrow the testamentary stay over time.  In the meantime, Lead Counsel also secured 26 proffers from Settling Defendants.  Currently, Rule 30(b)(6) depositions on certain topics are permitted.  Lead Counsel took Rule 30(b)(6) depositions of Deutsche Bank and Credit Suisse's corporate representatives on August 18, 2017 and September 18, 2017, respectively, on the topics of corporate organization and structure.

99.     Based on extensive review of the documents, beginning in late 2016, Lead Counsel began conferring with DOJ to seek approval to take Rule 30(b)(1) depositions of certain witnesses, including by sending DOJ a list of over 70 potential deponents in late November

2016. Discussions continued into early 2017 with DOJ consenting (at that time) to the depositions of certain individuals, rejecting the depositions of others, and requesting prior notice with the right to object to any other deposition.

100.    During this same time, Lead Counsel formed deposition discovery teams with responsibility for conducting all phases of deposition discovery for one or more Defendants. Each team is led by one or more senior attorneys at Plaintiffs' Counsel firms with extensive experience in conducting fact discovery in antitrust and other complex litigation. The deposition teams have identified and ranked witnesses for each Defendant and compiled extensive deposition preparation for approximately 50 of them, including detailed outlines, chronologies of chats, and potential exhibits. Notably, many of the relevant witnesses are no longer employed by Defendants and are, therefore, effectively non-parties for purposes of the litigation. This fact has helped shape Lead Counsel's approach to deposition discovery, especially for former employees located outside of the United States.

101.    Pursuant to the Settlement Agreements, in May 2017, Lead Counsel contacted counsel for most of the Settling Defendants to obtain information regarding potential witnesses Class Plaintiffs might seek to interview or depose, such as whether individuals were current or former employees, their last known contact information, and whether counsel for the Settling Defendant or other counsel represented them. Through various communications and meet and confers, Lead Counsel obtained the requested information.

102.    Pursuant to the Deposition Protocol (ECF No. 721), in July 2017, Lead Counsel contacted counsel for Credit Suisse and (then-non-settling Defendant) Deutsche Bank to provide notice of their intent to depose current or former employees on certain dates and requested contact information. Through this process and our independent investigation, Lead Counsel

determined the employment status, geographic location, and other pertinent information about Credit Suisse and Deutsche Bank current and former employees.

103.     Despite the testamentary stay of depositions described above, Lead Counsel have continued to pursue deposition discovery where permitted.  For example, Lead Counsel filed a Hague Convention request for the deposition of former Goldman Sachs FX trader, David Bowen, which was granted and which Lead Counsel are in the process of enforcing in the United Kingdom.  Lead Counsel have two other Hague Convention requests pending with the Court and anticipate filing several more Hague Convention requests in the next few weeks.  Lead Counsel have also subpoenaed or are in the process of negotiating with individual counsel for various former employees not covered by DOJ's stay for deposition dates in early 2018.

104.     In addition, Lead Counsel spent significant time with Class Plaintiffs and Plaintiffs' Counsel to coordinate the preparation of Class Plaintiffs for their depositions. Defendants have noticed Rule 30(b)(1) depositions of each individual Class Plaintiff and Rule 30(b)(6) depositions of each Class Plaintiff organization.  The Rule 30(b)(6) notices request testimony on 33 subject matters.  Like the work performed in coordinating the responses to Defendants' document requests, Lead Counsel prepared an initial joint draft set of responses and objections to the Rule 30(b)(6) notices.  Lead Counsel collected information regarding the scope of subject matter testimony that could be offered by each of the Class Plaintiffs, along with comments and edits from Class Plaintiffs and Plaintiffs' Counsel, and ultimately obtained sign-off from Class Plaintiffs on the final form of the responses and objections.  Similarly, Lead Counsel chaired a small group of designated Plaintiffs' Counsel that conducted the subsequent meet-and-confer discussions with relevant Defendants' counsel (primarily, Credit Suisse) over the scope of Class Plaintiffs' objections and responses and proposed testimony.  Additionally,

Lead Counsel have worked with Plaintiffs' Counsel in preparing Class Plaintiffs for their depositions. Small teams of Lead Counsel and Plaintiffs' Counsel lawyers have defended the depositions.

105.    As of January 12, 2018, 13 depositions of Class Plaintiffs have taken place. The depositions were conducted throughout the country, including in New York, Connecticut, Florida, and Texas. By March, we anticipate Lead Counsel and/or other designated Plaintiffs' Counsel will have prepared each of the Class Plaintiffs to be deposed, and each of the 27 Class Plaintiffs' depositions will have been completed.

### M. Lead Counsel Develop the Plan of Distribution

106.    Lead Counsel, working with designated Plaintiffs' Counsel, developed the Plan of Distribution for allocating the Net Settlement Fund among Authorized Claimants, in consultation with nationally recognized experts in settlement administration, experts in plans of distribution, and experts in the FX market. Lead Counsel also obtained the views of Allocation Counsel and incorporated their findings into the Plan of Distribution.

107.    In addition, Mr. Feinberg assisted in the design of the Plan of Distribution – in particular, with respect to implementation and administration issues. Mr. Feinberg is a leading specialist in mediation and alternative dispute resolution. He has extensive experience in the design, implementation, and administration of complex, high-volume claims programs and has served as the fund administrator for many of the nation's most widely known disputes and tragic disasters.

108.    Lead Counsel also were assisted by experts at Ankura Consulting and Velador Associates. Ankura's economists and professionals have expertise in the development of allocation formulas. Ankura's primary role in the design of the Plan of Distribution was in the development of the allocation algorithm, *de minimis* and automatic pay amounts, and identifying

class members across Settling Defendants' data sets for purposes of notice and claims administration.  Velador's quantitative analysts and FX market professionals assisted Lead Counsel in evaluating various allocation concepts and conducted data analysis supporting the Conversion Ratios for FX Instruments and FX Exchange-Traded Instruments, the currency pair and trade size Relative Damage Factors, and other components of the Plan of Distribution.  As described above in §III.H.1., Velador also participated in negotiations over the scope of data productions and prepared the transaction data for use in the Action, including the claims administration process.

109.    The Plan of Distribution also includes the input of experienced Allocation Counsel, who Lead Counsel designated to separately advocate for the interests of the Direct Settlement Class and the Exchange-Only Settlement Class, to achieve an equitable allocation of the Net Settlement Fund.  Counsel from Labaton Sucharow LLP and Lowey Dannenberg, P.C. represented the interests of the Direct Settlement Class.  *See* Joint Declaration, ECF No. 656. Counsel from Kirby McInerney LLP represented the interests of the Exchange-Only Settlement Class.  *See* Declaration, ECF No. 655.

110.    In sum, the Plan of Distribution was designed to fairly and reasonably allocate the Net Settlement Fund among Authorized Claimants based on the amount of damage the claimant sustained, relative to damage sustained by other Authorized Claimants.  Lead Counsel believe that the Plan of Distribution provides a fair, reasonable, and efficient method to equitably distribute the Net Settlement Fund and respectfully submit that the Plan of Distribution should be approved by the Court.

### N.  Other Significant Efforts Made by Lead Counsel

111.    Lead Counsel took significant steps to ensure that this Action was managed and prosecuted in an orderly and efficient manner.  To this end, Lead Counsel maintained close

control and monitored the work performed by Plaintiffs' Counsel working on this case in order to ensure efficiency. Among other things, Lead Counsel ensured that attorneys at each of the Plaintiffs' Counsel and our own firms undertook particular tasks appropriate to their levels of expertise, skill, and experience. Lead Counsel audited the time and expenses submitted by Plaintiffs' Counsel and removed any unapproved hours or expenses.

112.    Lead Counsel held weekly conference calls to discuss litigation strategy, ongoing and future assignments, and assess the needs of the case. Lead Counsel invited certain Plaintiffs' Counsel to these calls as appropriate. These calls ensured that Plaintiffs' Counsel participating in the litigation maintained a strong foundational knowledge of the case and efficiently pooled resources.

113.    Lead Counsel are currently devoting significant time to assisting class members in navigating the settlement process and submitting claims. Lead Counsel are in frequent contact with class members, responding to hundreds of inquiries by phone and email, and expect these inquiries to continue for some time.

## IV.    LEAD COUNSEL'S MEDIATION EFFORTS RESULTING IN THE SETTLEMENTS AND PRELIMINARY APPROVAL OF THE SETTLEMENT AGREEMENTS

### A. Overview of the Mediations

114.    As set forth more fully below, each of the Settlement Agreements was the product of separate and hard-fought, arm's-length negotiations by counsel highly experienced in complex litigation and antitrust law and was reached under the guidance of Mr. Feinberg, a well-respected and nationally recognized mediator.

115.    In preparation for each mediation, Lead Counsel held strategy calls to discuss and evaluate critical issues we knew would be addressed in negotiations, including the strengths and risks of the Action, the evidence our teams had unearthed during discovery, and damages

analysis.  Lead Counsel also prepared presentations as to liability and damages issues particular to each Settling Defendant, in close consultation with our experts.  At our request, the experts prepared damages analyses under a number of different scenarios.  We believed that this comprehensive preparation would best enable us to counter any refutation of our analysis that counsel for a Defendant offered.

116.    At the time each of the Settlement Agreements was reached, Class Plaintiffs and Lead Counsel had ample material to evaluate the strengths and weaknesses of the Settlement Classes' claims.  Following the execution of the JPMorgan Stipulation, each of the subsequent settlement negotiations was informed by settlement cooperation, including attorney proffers, and as the case progressed, through comprehensive document discovery.

117.    While Class Plaintiffs and Lead Counsel firmly believe that the evidence they intended to offer at class certification, summary judgment, and trial would fully support the Settlement Classes' claims, litigation is inherently uncertain.  There was no way to predict which inferences, interpretations, or testimony the Court or the jury would accept.

118.    Further, Settling Defendants have denied culpability throughout the Action and were prepared to mount aggressive defenses that could potentially foreclose any recovery for the Settlement Classes.  During the mediations, counsel for Settling Defendants repeatedly asserted that Class Plaintiffs:  (i) lacked evidence supporting an overarching conspiracy; (ii) lacked antitrust standing; and (iii) would be incapable of demonstrating class-wide impact and damages.

119.    Based on our experience and close knowledge of the facts and applicable law, Lead Counsel – firms well-versed in the prosecution of complex antitrust litigation – believe that the Settlement Agreements are in the best interests of the Settlement Classes.

### B. Negotiations Resulting in the First Wave of Nine Settlements

#### 1.    JPMorgan

120.    Discussions with JPMorgan began in 2014 and concluded after briefing and argument on the motion to dismiss the CAC.  At this time, Class Plaintiffs' claims were confined to the WM/Reuters Closing Spot Rates set at 4 p.m. London time.  Negotiations that resulted in the JPMorgan Stipulation occurred over the course of several months and included numerous telephone conversations, face-to-face meetings, and mediation with Mr. Feinberg.  During negotiations, Lead Counsel discussed the importance of settlement cooperation in prosecuting the case.  One of the key chat participants, Richard Usher, was a JPMorgan trader during the class period, and Class Plaintiffs identified other JPMorgan traders as important players.  Based on those discussions, Lead Counsel believed obtaining an early settlement with JPMorgan would allow Class Plaintiffs to possibly expand the claims and put pressure on other Defendants, including those with FX traders who participated in chat rooms with Mr. Usher and other JPMorgan traders.  At a mediation session on December 1, 2014, the mediator urged resolution of various issues (*e.g.*, the extent and timing of the cooperation provisions, the settlement class definition, and the scope of the release).  Over the course of several more weeks, the parties and Mr. Feinberg participated in numerous telephone conference calls regarding specific proposed terms of a settlement agreement.  As a result of these discussions and at the urging of the mediator, after hard-fought, arm's-length negotiations between highly experienced counsel, all outstanding disagreements were resolved and the agreement was executed.

121.    On January 5, 2015, Class Plaintiffs signed the Stipulation and Agreement of Settlement with JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A ("JPMorgan Stipulation").  ECF No. 247-1.  The JPMorgan Stipulation was an "ice-breaker" settlement, as it was the first Settlement Agreement executed in this Action.  It was a significant step forward in

reaching future settlements because it brought other Defendants to the point of serious negotiations.  The JPMorgan Stipulation also obligated JPMorgan to provide immediate cooperation.  The fact that JPMorgan's cooperation came early in the case greatly enhanced its value.

122.    On January 30, 2015, Class Plaintiffs moved for preliminary approval of the JPMorgan Stipulation.  ECF No. 245.  Class Plaintiffs subsequently withdrew the motion, as they anticipated filing a superseding motion for preliminary approval of amendments to the JPMorgan Stipulation in conjunction with a motion for preliminary approval of additional settlements.

123.    In May 2015, Class Plaintiffs and JPMorgan, with the assistance of the mediator, began negotiating the terms of an amended stipulation.  Class Plaintiffs and JPMorgan reached an agreement in principle on additional monetary consideration and amendments on or about June 10, 2015.  The amendments included modifications to the definitions of the Settlement Classes and the release, as further described below.

124.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began multilateral negotiations on certain common issues.  Those negotiations are described below in §IV.B.10.

125.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and JPMorgan signed the JPMorgan Amended Stipulation.  ECF No. 481-1.

126.    The cash portion of the JPMorgan Amended Stipulation consists of $104,500,000.  JPMorgan Amended Stip., ¶10(b).  The Direct Settlement Amount is $99,000,000.  *Id.*, ¶2(o).  The Exchange-Only Settlement Amount is $5,000,000.  *Id.*, ¶2(s).  JPMorgan agreed to pay an

additional $500,000 for notice and administration costs. *Id.*, ¶10(b). All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement. *Id.*, ¶¶10(b)-11(j).

127.    JPMorgan also agreed to provide extensive cooperation to Class Plaintiffs. This cooperation includes attorney proffers, production of transaction data, production of documents produced to government bodies, production of additional data and documents as requested by Class Plaintiffs, witness interviews, depositions and affidavits, and trial testimony. *Id.*, at ¶14. These obligations are continuing until the later of: (1) the date when final judgment has been rendered, with no remaining rights of appeal, in the Action against all Defendants; or (2) seven (7) years after the Court enters the Preliminary Approval Order. *Id.*, at ¶14(b)(xi).

### 2.    UBS

128.    Shortly after Class Plaintiffs' January 5, 2015 disclosure that the JPMorgan Stipulation had been executed (ECF No. 233), UBS requested a meeting to discuss settlement.

129.    UBS was the amnesty applicant under DOJ Antitrust Division's Leniency Program, pursuant to which DOJ granted UBS conditional immunity from prosecution for EUR/USD collusion and entered into a non-prosecution agreement covering other currency pairs. The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA"), Pub. L. No. 108-237, tit. II 118 Stat. 661 (2004), reduces potential damages liability for the amnesty applicant if it provides "satisfactory cooperation" to plaintiffs. *Id.*, §213. By providing "satisfactory cooperation" to plaintiffs, an amnesty applicant may reduce its civil damages from treble to single damages and may avoid joint and several liability. In contrast, non-leniency defendants still face joint and several liability and treble damages. *Id.*, §214. Given UBS's position as the amnesty applicant, UBS's damages exposure was significantly less than non-leniency defendants.

130.    Negotiations with UBS occurred over the course of several months through numerous telephone calls and in-person meetings, including meetings between counsel on January 22-23, 2015, and mediation sessions with Mr. Feinberg on February 9-10, 2015, during which UBS provided Class Plaintiffs with a pre-settlement attorney proffer.  During the course of the February 9-10, 2015 meditation session, UBS proffered additional collusive conduct, including manipulation of multiple currency pairs (including fixing bid-ask spreads) throughout the day and confirmed Class Plaintiffs' existing allegations of fixing benchmark rates.  UBS also identified additional banks and other market participants they knew to have participated in the additional chat rooms where some of the collusive conduct occurred.  Ultimately, the proffer resulted in a broadening of the settlement class definition, as compared with the JPMorgan Stipulation.  The definition of Released Claims was also expanded to accommodate spread-fixing conduct, which Class Plaintiffs subsequently alleged in the SAC.

131.    Over the course of several more days, the mediator participated in numerous telephone conference calls regarding specific proposed terms.  As a result of these discussions, all outstanding disagreements were eventually resolved.  On February 11, 2015, Class Plaintiffs and UBS reached an agreement in principle.  On February 12, 2015, UBS and Class Plaintiffs signed a term sheet.  In reducing the term sheet to a formal stipulation of settlement, the parties mediated several issues with the assistance of Mr. Feinberg.

132.    After hard-fought, arm's-length negotiations between highly experienced counsel, on March 6, 2015, Class Plaintiffs and UBS reached agreement on the terms of the Stipulation and Agreement of Settlement with UBS AG, UBS Group AG, and UBS Securities LLC ("UBS Stipulation").  The JPMorgan Stipulation provided the framework for the UBS Stipulation

agreement with two main modifications to the settlement class definition and the release of claims.

133.    The UBS Stipulation obligated UBS to provide immediate cooperation.  The fact that UBS's cooperation came early in the case greatly enhanced its value.  This is because other Defendants became aware that UBS was cooperating with Class Plaintiffs and DOJ.  UBS's cooperation allowed Class Plaintiffs to fill in the gaps as to Defendants' participation.  UBS's cooperation, along with JPMorgan's, early in the process, allowed Class Plaintiffs to negotiate with other Defendants with the benefit of knowledge it would have taken far longer to obtain through adversarial discovery.

134.    Class Plaintiffs and UBS, with the assistance of the mediator, negotiated the terms of amendments to the UBS Stipulation over the course of the next several months.  Class Plaintiffs and UBS reached an agreement in principle on additional monetary consideration and amendments on June 9, 2015.  On August 4, 2015, the parties executed a corresponding term sheet.  The amendments included modifications to conform the definitions of the Settlement Classes and the release of claims.

135.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began multilateral negotiations on certain common issues.  Those negotiations are described below in §IV.B.10.

136.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 5, 2015, Class Plaintiffs and UBS signed the UBS Amended Stipulation.  ECF No. 481-2.

137.    The total cash portion of the UBS Amended Stipulation consists of $141,075,000. UBS Amended Stip., ¶10(b).  The Direct Settlement Amount is $135,000,000.  *Id.*, ¶2(o).  The Exchange-Only Settlement Amount is $6,075,000.  *Id.*, ¶2(s).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶¶10(b), 11(j).

138.    All other terms of the UBS Amended Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 3.    Citigroup

139.    Following the disclosure of the JPMorgan Stipulation, Citigroup contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on February 9, 2015 and mediations with Mr. Feinberg on February 12, 2015 and March 4, 2015.  Citigroup was one of the largest FX market makers during the settlement class period.  Citigroup FX traders had participated in chat rooms with traders from JPMorgan and UBS.  For example, former Citigroup FX trader Rohan Ramchandani is facing criminal charges in 2018 related to alleged collusion with traders from JPMorgan and UBS, among others.  Cooperation from JPMorgan and UBS allowed Lead Counsel to negotiate from a position of strength and obtain favorable terms.

140.    On approximately March 6, 2015, Class Plaintiffs and Citigroup reached an agreement in principle to settle claims on behalf of the Direct Settlement Class.  On March 27, 2015, Class Plaintiffs and Citigroup executed a corresponding term sheet.

141.    While negotiations over a formal stipulation of settlement were in progress, on approximately May 8, 2015, the parties, with the assistance of the mediator, reached an

agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class. On May 14, 2015, Class Plaintiffs and Citigroup executed a corresponding term sheet that called for additional monetary consideration and cooperation.

142.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began multilateral negotiations on certain common issues. Those negotiations are described below in §IV.B.10.

143.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and Citigroup signed the Citigroup Stipulation. ECF No. 481-3.

144.    The total cash portion of the Citigroup Stipulation consists of $402,000,000. Citigroup Stip., ¶10(h). The Direct Settlement Amount is $394,000,000, which was paid upon preliminary approval of the Citigroup Stipulation. *Id.*, ¶10(b). The Exchange-Only Settlement Amount is $8,000,000, which is payable upon final approval of the Citigroup Stipulation. *Id.*, ¶10(b). All funds are non-reversionary if the Court approves the settlement. *Id.*, ¶11(j).

145.    All other terms of the Citigroup Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 4.  Barclays

146.    Following the disclosure of the JPMorgan settlement, Barclays contacted Class Plaintiffs to convey interest in possible resolution of the Action. Negotiations occurred over the course of several months, through numerous telephone calls and in-person meetings, including a meeting between counsel on January 22, 2015 and February 13, 2015 and mediation with Mr. Feinberg on March 4, 2015, during which the mediator urged resolution of various issues.

The JPM and UBS settlements, and cooperation from these Defendants, greatly assisted Lead Counsel during negotiations.  One of the most prominent FX traders and a former employee of Barclays, Chris Ashton, participated in chats with JPM and UBS traders such as Mr. Usher and Niall O'Riordan.

147.    On March 9, 2015, Class Plaintiffs and Barclays reached an agreement in principle to settle claims on behalf of the Direct Settlement Class.  On March 31, 2015, Class Plaintiffs and Barclays executed a corresponding term sheet.

148.    While negotiations over a formal stipulation of settlement were in progress, on April 20, 2015, the parties, with the assistance of the mediator, reached an agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class.  On June 3, 2015, Class Plaintiffs and Barclays executed a corresponding term sheet.

149.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began multilateral negotiations on certain common issues.  Those negotiations are described below in §IV.B.10.

150.    After hard-fought, arm's-length negotiations between highly experienced counsel, on September 30, 2015, Class Plaintiffs and Barclays signed the Barclays Stipulation.  ECF No. 481-4.

151.    The total cash portion of the Barclays Stipulation consists of $384,000,000.  Barclays Stip., ¶10(b).  The Direct Settlement Amount is $375,000,000.  *Id.*, ¶2(q).  The Exchange-Only Settlement Amount is $9,000,000.  *Id.*, ¶2(u).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶11(j).

152.    All other terms of the Barclays Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 5. Bank of America

153.    Following Class Plaintiffs' submission of the motion for preliminary approval of the JPMorgan Stipulation, Bank of America contacted Class Plaintiffs to convey interest in possible resolution of the Action. Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on March 6, 2015 and mediation with Mr. Feinberg on April 2, 2015, during which the mediator urged resolution of various issues. On April 7, 2015, Class Plaintiffs and Bank of America reached an agreement in principle to settle claims on behalf of the Direct Settlement Class. On April 9, 2015, Class Plaintiffs and Bank of America executed a corresponding term sheet.

154.    While negotiations over a formal stipulation of settlement were in progress, on approximately April 23, 2015, the parties reached an agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class for additional monetary consideration and cooperation.

155.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began multilateral negotiations on certain common issues. Those negotiations are described below in §IV.B.10.

156.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and Bank of America signed the Bank of America Stipulation. ECF No. 481-5.

157.    The total cash portion of the Bank of America Stipulation consists of $187,500,000.  Bank of America Stip., ¶10(b).  The Direct Settlement Amount is $180,000,000. *Id.*, ¶2(q).  The Exchange-Only Settlement Amount is $7,500,000.  *Id.*, ¶2(u).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement. *Id.*, ¶¶10(b), 11(j).

158.    All other terms of the Bank of America Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 6.    Goldman Sachs

159.    In late February, Goldman Sachs contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on March 4, 2015 and mediation during which Mr. Feinberg urged resolution of various issues. On March 12, 2015, Class Plaintiffs and Goldman Sachs reached an agreement in principle to settle claims on behalf of the Direct Settlement Class.  On April 10, 2015, Class Plaintiffs and Goldman Sachs executed a corresponding term sheet.

160.    While negotiations over a formal stipulation and agreement of settlement were in progress, on approximately April 30, 2015, the parties, with the assistance of the mediator, reached an agreement in principle to settle claims on behalf of the Exchange-Only Settlement Class.  On May 11, 2015, Class Plaintiffs and Goldman Sachs executed a corresponding term sheet that called for additional monetary consideration and cooperation.

161.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began

multilateral negotiations on certain common issues. Those negotiations are described below in §IV.B.10.

162. After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and Goldman Sachs signed the Goldman Sachs Stipulation. ECF No. 481-6.

163. The total cash portion of the Goldman Sachs Stipulation consists of $135,000,000. Goldman Sachs Stip., ¶10(b). The Direct Settlement Amount is $129,500,000. *Id.*, ¶2(o). The Exchange-Only Settlement Amount is $5,000,000. *Id.*, ¶2(s). Goldman Sachs will pay an additional $500,000 for notice and administration costs. *Id.*, ¶10(b). All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement. *Id.*, ¶¶10(b), 11(j).

164. All other terms of the Goldman Sachs Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

## 7. RBS

165. Shortly following the disclosure of the JPMorgan Stipulation, RBS contacted Class Plaintiffs to convey interest in possible resolution of the Action. Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including meetings between counsel on March 6, 2015 and April 7, 2015 and mediation with Mr. Feinberg on April 17, 2015 and April 29, 2015, during which time the mediator urged resolution of various issues. At the April 29, 2015 mediation, Class Plaintiffs and RBS reached an agreement in principle to settle claims on behalf of the Direct Settlement Class and the Exchange-Only Settlement Class. On May 7, 2015, Class Plaintiffs and RBS executed a term sheet.

166.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began multilateral negotiations on certain common issues.  Those negotiations are described below in §IV.B.10.

167.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 2, 2015, Class Plaintiffs and RBS signed the RBS Stipulation.  ECF No. 481-7.

168.    The total cash portion of the RBS Stipulation consists of $255,000,000.  RBS Stip., ¶10(b).  The Direct Settlement Amount is $247,000,000.  *Id.*, ¶2(o).  The Exchange-Only Settlement Amount is $8,000,000.  *Id.*, ¶2(s).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶¶10(b), 11(j).

169.    All other terms of the RBS Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 8.  BNP Paribas

170.    In early March 2015, BNP Paribas contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on April 7, 2015 and mediation with Mr. Feinberg on May 6, 2015, during which BNP Paribas provided Class Plaintiffs with a settlement proffer.  After subsequent sessions with the mediator, on May 29, 2015, Class Plaintiffs and BNP Paribas reached an agreement in principle to settle claims on behalf of the Direct Settlement Class and the Exchange-Only Settlement Class.  On June 5, 2015, Class Plaintiffs and BNP Paribas executed a term sheet.

171.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began

multilateral negotiations on certain common issues.  Those negotiations are described below in §IV.B.10.

172.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and BNP Paribas signed the BNP Paribas Stipulation.  ECF No. 481-8.

173.    The total cash portion of the BNP Paribas Stipulation consists of $115,000,000. BNP Paribas Stip., ¶10(b).  The Direct Settlement Amount is $110,000,000.  *Id.*, ¶2(o).  The Exchange-Only Settlement Amount is $5,000,000.  *Id.*, ¶2(s).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶¶10(b), 11(j).

174.    All other terms of the BNP Paribas Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 9.  HSBC

175.    On April 14, 2015, HSBC contacted Class Plaintiffs to convey interest in possible resolution of the Action.  Negotiations occurred over the course of several months through numerous telephone calls and in-person meetings, including a meeting between counsel on April 30, 2015, during which HSBC provided Class Plaintiffs with a settlement proffer, and mediation with Mr. Feinberg on May 29, 2015, at which time the mediator urged resolution of various issues.  At the May 29, 2015 mediation, Class Plaintiffs and HSBC reached an agreement in principle.

176.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to each of nine Settling Defendants, the parties began

multilateral negotiations on certain common issues.  Those negotiations are described below in §IV.B.10.

177.    After hard-fought, arm's-length negotiations between highly experienced counsel, on October 1, 2015, Class Plaintiffs and HSBC signed the HSBC Stipulation.  ECF No. 481-9.

178.    The total cash portion of the HSBC Stipulation consists of $285,000,000.  HSBC Stip., ¶10(b).  The Direct Settlement Amount is $279,000,000.  *Id.*, ¶2(o).  The Exchange-Only Settlement Amount is $6,000,000.  *Id.*, ¶2(s).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶¶10(b), 11(j).

179.    All other terms of the HSBC Stipulation are consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 10. Multilateral Negotiations

180.    In June 2015, after Class Plaintiffs reached agreements in principle and/or signed term sheets and sent draft stipulations to JPMorgan, UBS, Citigroup, Barclays, Bank of America, Goldman Sachs, RBS, BNP Paribas, and HSBC, the parties began multilateral negotiations on certain common issues, such that the final Settlement Agreements could be harmonized on key terms to allow Class Plaintiffs to file an omnibus motion for preliminary approval as to all agreements, mail a single notice, and submit a single plan of distribution for Court approval.

181.    The parties exchanged numerous draft stipulations between June and September 2015 and negotiated terms during the course of numerous teleconferences.

182.    On August 12, 2015, with the assistance of Mr. Feinberg, agreements were reached on the remaining terms, subject to technical edits and finalizing the exhibits to the Settlement Agreements (proposed forms of the preliminary approval order and final judgments and orders of dismissal).  Those technical and exhibit negotiations took place in August and

September and included the exchange of numerous drafts and participation in numerous teleconferences.  The nine agreements were executed between September 30, 2015 and October 5, 2015.

### 11. Preliminary Approval

183.    On October 22, 2015, Lead Counsel filed a motion for preliminary approval of settlements with Bank of America, Barclays, BNP Paribas Group, Citigroup, Goldman Sachs, HSBC, JPMorgan, RBS, and UBS.  ECF No. 479.  The Court invited preliminary objections and comments to the preliminary approval motion to assist the Court in evaluating the motion.  ECF No. 487.  Non-settling defendants Credit Suisse, Deutsche Bank, Morgan Stanley, BTMU, RBC, Soc Gen, and Standard Chartered filed an objection.  ECF No. 495, 485.  Plaintiffs in a related case, *Allen v. Bank of America Corp.*, No. 15-cv-4285 (S.D.N.Y.), also objected to the settlements.  ECF No. 496.  The Court held a hearing on the motion on December 3, 2015, heard argument, and granted preliminary approval of the settlements on December 15, 2015.  ECF No. 536.  Following preliminary approval, Eduardo Negrete and Gervasio Negrete[8] filed an objection to preliminary approval of the Citigroup settlement, which the Court overruled following oral argument.  ECF Nos. 587, 595, 614.

184.    In light of the likelihood of additional settlements, Class Plaintiffs moved for an adjournment of the commencement of the notice process, which was set to begin on February 1, 2017.  The Court adjourned the notice date.  ECF No. 718.

---

[8]    At the time of the objection, the Negretes had an unrelated case pending before the Hon. Robert W. Sweet.  *Negrete v. Citibank, N.A.*, 15-cv-7250 (S.D.N.Y.).  The Negretes have since voluntarily dismissed their case.  Stipulation of Voluntary Dismissal, *Negrete v. Citibank, N.A.*, 15-cv-7250 (S.D.N.Y. Aug. 18, 2017), ECF No. 95.

185.    On June 27, 2017, the Negretes filed an objection to the forms of notice, which Class Plaintiffs and Citigroup jointly opposed.  ECF Nos. 798, 805.  The Court heard oral argument on the objection on July 11, 2017 and denied the relief the Negretes sought.  ECF No. 807.

### C.  Negotiations Resulting in the Second Wave of Five Settlements

#### 1.    BTMU

186.    Class Plaintiffs and BTMU discussed their respective interests in possible resolution of the Action in early 2016 and whether it made sense to mediate.  After exchanging views, a mediation with Mr. Feinberg was held on April 4, 2016 in Washington, D.C.  Possible terms of settlement were discussed, but no final agreement was reached as to any of the outstanding issues.

187.    After this first mediation session, Class Plaintiffs and BTMU continued to discuss terms and open issues through the mediator.  As a result of these continued discussions and conversations, the parties reached an agreement in principle on the financial terms of the Settlement with respect to both Settlement Classes by telephone on August 29, 2016.

188.    On September 9, 2016, Class Plaintiffs sent BTMU a draft settlement agreement.  After hard-fought, arm's-length negotiations between highly experienced counsel, on February 14, 2017, Class Plaintiffs and BTMU signed the BTMU Stipulation.  ECF No. 822-1.

189.    The total cash portion of the BTMU Stipulation consists of $10,500,000.  BTMU Stip., ¶10(h).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  BTMU Stip. at ¶11(j).

190.    All other terms of the BTMU Stipulation are generally consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 2.  Morgan Stanley

191.    Class Plaintiffs and Morgan Stanley discussed their respective interests in possible resolution of the Action.  A mediation with Mr. Feinberg occurred on December 16, 2016 in New York, NY.  During that mediation, Class Plaintiffs and Morgan Stanley reached an agreement in principle to settle claims on behalf of both Settlement Classes.

192.    On December 23, 2016, Lead Counsel sent a draft settlement agreement to Morgan Stanley.  In April 2017, after Class Plaintiffs reached agreements in principle and sent draft stipulations to Morgan Stanley, RBC, Soc Gen, and Standard Chartered, the parties began multilateral negotiations on certain common issues.

193.    After hard-fought, arm's-length negotiations between highly experienced counsel, on July 28, 2017, Class Plaintiffs and Morgan Stanley signed the Morgan Stanley Stipulation. ECF No. 822-2.

194.    The total cash portion of the Morgan Stanley Stipulation consists of $49,750,000 for the Settlement Fund, and $250,000 for notice and claims administration.  Morgan Stanley Stip., ¶10(b).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶11(j).

195.    All other terms of the Morgan Stanley Stipulation are generally consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 3.  RBC

196.    Class Plaintiffs and RBC discussed their respective interests in possible resolution of the Action.  A mediation with Mr. Feinberg occurred on December 15, 2016 in New York, NY.  During that mediation, Class Plaintiffs and RBC reached an agreement in principle to settle claims on behalf of both Settlement Classes.

197.    On December 23, 2016, Lead Counsel sent a draft settlement agreement to RBC. In April 2017, after Class Plaintiffs reached agreements in principle and sent draft stipulations to Morgan Stanley, RBC, Soc Gen, and Standard Chartered, the parties began multilateral negotiations on certain common issues.

198.    After hard-fought, arm's-length negotiations between highly experienced counsel, on July 27, 2017, Class Plaintiffs and RBC signed the RBC Stipulation.  ECF No. 822-3.

199.    The total cash portion of the RBC Stipulation consists of $15,500,000.  RBC Stip., ¶10(g).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶11(j).

200.    All other terms of the RBC Stipulation are generally consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 4.  Soc Gen

201.    Through the mediator, Mr. Feinberg, Class Plaintiffs and Soc Gen discussed their respective interests in possible resolution of the Action.  A mediation with Mr. Feinberg occurred on February 7, 2017 in New York, NY.  During that mediation, Class Plaintiffs and Soc Gen reached an agreement in principle to settle claims on behalf of both Settlement Classes.

202.    On February 8, 2017, Lead Counsel sent a draft settlement agreement to Soc Gen. In April 2017, after Class Plaintiffs reached agreements in principle and sent draft stipulations to Morgan Stanley, RBC, Soc Gen, and Standard Chartered, the parties began multilateral negotiations on certain common issues.

203.    After hard-fought, arm's-length negotiations between highly experienced counsel, on July 27, 2017, Class Plaintiffs and Soc Gen signed the Soc Gen Stipulation.  ECF No. 822-4.

204.    The total cash portion of the Soc Gen Stipulation consists of $18,000,000.  Soc Gen Stip., ¶10(g).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶11(j).

205.    All other terms of the Soc Gen Stipulation are generally consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 5.  Standard Chartered

206.    Class Plaintiffs and Standard Chartered discussed their respective interests in possible resolution of the Action.  A mediation with Mr. Feinberg occurred on February 8, 2017 in New York, NY.  Possible terms of settlement were discussed, but no final agreement was reached as to any of the outstanding issues.

207.    After this first mediation session, Class Plaintiffs and Standard Chartered continued to discuss terms and open issues through the mediator.  As a result of these continued discussions, the parties reached an agreement in principle on the financial terms of the settlement with respect to both Settlement Classes by telephone on February 22, 2017.

208.    On February 23, 2017, Lead Counsel sent a draft settlement agreement to Standard Chartered.  In April 2017, after Class Plaintiffs reached agreements in principle and sent draft stipulations to RBC, Morgan Stanley, Soc Gen, and Standard Chartered, the parties began multilateral negotiations on certain common issues.

209.    After hard-fought, arm's-length negotiations between highly experienced counsel, on July 27, 2017, Class Plaintiffs and Standard Chartered signed the Standard Chartered Stipulation.  ECF No. 822-5.

210.    The total cash portion of the Standard Chartered Stipulation consists of $17,200,000.  Standard Chartered Stip., ¶10(g).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶11(j).

211.    All other terms of the Standard Chartered Stipulation are generally consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

### 6.  Preliminary Approval

212.    On July 28, 2017, Class Plaintiffs filed a motion for preliminary approval of settlements with BTMU, Morgan Stanley, RBC, Soc Gen, and Standard Chartered.  ECF No. 820.  There were no objections to the motion.  After a hearing on September 5, 2017, the Court granted preliminary approval to the settlements with BTMU, Morgan Stanley, RBC, Soc Gen, and Standard Chartered.  ECF No. 866.

### D.  Negotiations Resulting in Deutsche Bank Settlement and Preliminary Approval

213.    At various times between 2015 and 2017, Class Plaintiffs and Deutsche Bank discussed their respective interests in possible resolution of the Action, including an in-person meeting.   Two mediation sessions with Mr. Feinberg occurred on April 6, 2015 and September 30, 2015.  During these mediations, the parties discussed possible terms of settlement, but no agreement was reached as to any of the outstanding issues.

214.    After these mediation sessions, counsel continued to discuss terms and open issues through the mediator.   No agreements as to any terms were reached through these discussions.

215.    A third mediation session was held on July 26, 2017 in Washington, D.C.  During this mediation, the parties discussed possible terms of settlement, but no agreement was reached as to any of the outstanding issues.

216.    After this third mediation session, counsel continued to discuss terms and open issues through the mediator.  As a result of these continued discussions, the parties reached an agreement in principle with respect to both Settlement Classes by telephone on August 18, 2017.

217.    On August 28, 2017, Class Plaintiffs sent Deutsche Bank a draft settlement agreement.  After hard-fought, arm's-length negotiations between highly experienced counsel, on September 29, 2017, Class Plaintiffs and Deutsche Bank signed the Deutsche Bank Stipulation.  ECF No. 889.

218.    The total cash portion of the Deutsche Bank Stipulation consists of $190,000,000.  Deutsche Bank Stip., ¶10(h).  All funds were paid upon preliminary approval and are non-reversionary if the Court approves the settlement.  *Id.*, ¶11(j).

219.    All other terms of the Deutsche Bank Stipulation are generally consistent with the stipulations with the other Settling Defendants, including the definition of the settlement classes, release of claims, and scope and timing of cooperation obligations.

220.    On September 29, 2017, following a hearing on the motion, the Court preliminarily approved the Deutsche Bank Stipulation.

### E.  Motions to Approve the Form and Manner of Notice and Preliminary Approval of the Plan of Distribution

221.    Following production and analysis transaction data from most of the first nine Settling Defendants in mid-2016, Lead Counsel filed a proposed Plan of Distribution and the proposed form and manner of notice on August 31, 2016.  ECF No. 653.  Plaintiffs in the related action, *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300 (S.D.N.Y.), objected to the proposed

form of notice, which Class Plaintiffs opposed.  ECF No. 828.  The motion was heard on September 5, 2017, and the Court overruled the objection.  ECF No. 836.

222.    On September 28, 2016, in preparation for the hearing on the motion on the Plan of Distribution and notice, Lead Counsel filed an updated version of certain supporting documents.  ECF No. 668.  Lead Counsel prepared to argue the motion by, among other things, drafting a PowerPoint presentation explaining the Plan of Distribution, including example applications of the allocation formulas to particular trades.  Mr. Feinberg, Ankura Consulting, and Velador Associates assisted in the preparation of the presentation.

223.    On October 5, 2016, the Court heard the motion.  *See* ECF No. 672.  The Court approved the Plan of Distribution and proposed form and manner of notice on December 20, 2016.  ECF No. 700.  Notice was scheduled to begin on February 1, 2017.  However, in light of continuing settlement discussions, which eventually led to six additional settlements, at Lead Counsel's request, the Court deferred the commencement of the notice process.  ECF No. 719.

224.    On July 28, 2017, Class Plaintiffs filed an updated motion for approval of updates to the Plan of Distribution and notice, including additional detail as a result of continuing analysis of transaction data and to conform the documents to include the settlements with BTMU, Morgan Stanley, RBC, Soc Gen, and Standard Chartered.  ECF Nos. 824 and 825.  In preparation for a hearing on the motion on September 5, 2017, Lead Counsel, among other things, updated the PowerPoint presentation that explained the Plan of Distribution.  The Court granted the motion on September 8, 2017.  ECF No. 864.

225.    On September 29, 2017, Lead Counsel filed a motion for approval of further updates to the Plan of Distribution and notice to conform the documents to include the Deutsche

Bank Stipulation.  Following a hearing and argument on the motion, the Court granted the motion.  ECF Nos. 882, 883.

## V.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

226.    The Notice informed the Settlement Classes that Lead Counsel would apply for an award of attorneys' fees and reimbursement of litigation expenses, the total of which would not exceed 18% of the Settlement Fund. On behalf of all Plaintiffs' Counsel, Lead Counsel are applying for attorneys' fee award of 16.51% of the Settlement Fund (or $381,353,830.27, plus interest) and reimbursement of $22,495,669.73 in litigation expenses, which equates to 0.97% of the Settlement Fund.

227.    While the notice and claims administration process in this case will have many variables that can impact the overall cost, based on our experience and discussions with the Claims Administrator and Ankura Consulting, Lead Counsel estimate that total notice and administration costs in this case will be approximately $12,000,000 (0.52% of the Settlement Fund).  Accordingly, Lead Counsel estimate that approximately 82% of the Settlement Fund, $1,894,425,500, plus interest, will be distributed to the Settlement Classes.

228.    A summary of Plaintiffs' Counsel's hours, lodestar, and litigation expenses through and including December 31, 2017 is attached hereto as Exhibit 1.  Declarations in support of each firm's lodestar, as well as expenses incurred, are submitted herewith as Exhibits 2 through 33.  These Declarations set forth the names of the attorneys and professional support staff who worked on the Action, their hourly rates and number of hours billed, the lodestar value of the time, the expenses incurred by the firms, and the background and experience of the firms and attorneys.  Plaintiffs' Counsel are not seeking fees for work done in connection with

preparing the Fee and Expense Application.  In total, Plaintiffs' Counsel invested more than 330,000 hours in the prosecution of the Action for an aggregate lodestar of over $174 million.

229.    The Scott+Scott partners responsible for developing and carrying out case strategy and tactics and managing this case are Christopher M. Burke, Walter W. Noss, and Kristen M. Anderson.  The Hausfeld partners are Michael D. Hausfeld, Reena A. Gambhir, and Timothy S. Kearns.  Experienced attorneys at our respective firms undertook particular tasks appropriate for their levels of expertise, skill, and experience, and more junior attorneys, paralegals, and professionals worked on matters more appropriate for their experience levels. Lead Counsel maintained daily control and monitored the work performed by Plaintiffs' Counsel in this case.  Throughout the prosecution of this Action, work assignments were also allocated among Plaintiffs' Counsel in a manner that ensured efficiency and avoided unnecessary duplication of effort.  Lead Counsel convened weekly calls to ensure tasks were being met by the firms to whom they were assigned.

230.    As Plaintiffs' Counsel's firm résumés and attorney bios (attached to the individual firm Declarations) demonstrate, Plaintiffs' Counsel are among the most experienced and skilled firms in the antitrust and commodities litigation fields and have successful track records in some of the largest class actions throughout the country, including within this Circuit.  Among Plaintiffs' Counsel are a number of attorneys who have tried class actions.  This meant that, if necessary, Plaintiffs' Counsel have the skill and experience to present a persuasive case to a jury. In litigation such as this, skilled trial counsel, backed by ample resources, are vital to securing a favorable resolution.  Moreover, the substantial recovery achieved here reflects the superior quality of Plaintiffs' Counsel's representation.

231.    In addition to the case-related risks discussed in the Fee Memorandum, Plaintiffs' Counsel bore the risk of litigating this Action entirely on a contingent basis.  There are numerous examples where plaintiffs' counsel in contingency fee cases have worked thousands of hours and advanced substantial sums, only to receive no compensation.  From personal experience, Lead Counsel are fully aware that despite the most vigorous and competent of efforts, a law firm's success in contingent litigation on behalf of a class such as this is never guaranteed.

232.    Throughout this Action's four-plus year pendency, Plaintiffs' Counsel have ensured that sufficient attorney resources were dedicated to prosecuting the claims, in particular, to conducting voluminous document discovery.  Plaintiffs' Counsel have also ensured sufficient funds were available to advance the expenses required to pursue and complete such complex litigation.  In total, Plaintiffs' Counsel advanced $22,495,669.73 in unreimbursed expenses in the prosecution and settling of this Action.  Plaintiffs' Counsel's investment of this amount of hard costs demonstrates the commitment, as well as the risk, Plaintiffs' Counsel were willing to take in prosecuting the case.  Indeed, even once a settlement is reached and approved by a court, there is still a risk of loss. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) (vacating final approval of $7.25 billion antitrust class action settlement).   A summary of Plaintiffs' Counsel's expenses by category is attached to this Declaration as Exhibit 1.

233.    From the inception of this Action, Plaintiffs' Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the Action and, at a minimum, would not recover any expenses until the Action was successfully resolved, or partially resolved.  Plaintiffs' Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate them for the lost use or opportunity cost of funds

advanced to prosecute the claims against Settling Defendants.  Thus, Plaintiffs' Counsel were motivated to, and did, take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.  Lead Counsel maintained strict control over the expenses in this Action.  Indeed, the majority of the expenses incurred were paid out of a litigation fund created by Lead Counsel and maintained by Scott+Scott (the "Litigation Fund").  Payment of expenditures from the Litigation Fund required personal approval from Scott+Scott partners.  Plaintiffs' Counsel collectively contributed $18,739,682.53 to the Litigation Fund.  A summary of the expenses paid and incurred by the Litigation Fund by category is set forth in Exhibit 3 to the Declaration of Daryl F. Scott, which is attached as Exhibit 2 to this Declaration.

234.    Most of the litigation expenses incurred, $17,222,662.19, were for expert work. Plaintiffs' Counsel successfully engaged highly skilled and specialized FX market practitioners, FX scholars, finance experts, industrial organization economists, and other subject-matter experts, which proved essential to the development of Plaintiffs' case.

235.    Lead Counsel first retained Velador Associates.  The professionals at Velador have over 200 years of combined trading experience.  Lead Counsel relied on Velador's expertise on a wide array of issues throughout the course of the Action.  Velador's professionals participated in the development of the Plan of Distribution and data analysis to produce the detailed allocation formulas, as discussed in §III.M. above.  Velador professionals also served as Class Plaintiffs' experts in the lengthy transaction data meet-and-confer process, discussed in §III.H.1. above.  Significantly, once the data was produced, Velador's team of FX market practitioners and quantitative analysts "cleaned" the data to remove errors and "normalized" the data into a common format in the form of unified extracts (discussed in detail in §III.H.1. above).

Velador's data work was a prerequisite to empirically testing models of class-wide impact and damages and is also essential to the claims administration process, as Settling Defendants' transaction data provides the basis of all "Option 1" calculations, where claimants elect to rely on the transaction data produced by Settling Defendants for purposes of their claim calculations. Additional work Velador performed includes, but is not limited to, assisting Lead Counsel in drafting complaints, discovery requests, preparation for mediations, and technical aspects of chat review, as well as providing a market perspective on various other merits issues.

236.    Preparing to prove liability, class-wide impact, and damages required locating and engaging highly skilled and specialized FX scholars, finance experts, and industrial organization economists.  Lead Counsel engaged two of the world's leading scholars on FX microstructure who have published extensively about FX in the academic literature, as well as leading experts on finance and related antitrust issues.  These experts were engaged to develop models of class-wide impact and damages.  In addition, Lead Counsel engaged an industrial organization economist to assist in investigating class-wide liability issues, as well as one of the world's leading statisticians.  The identities of Class Plaintiffs' testifying experts will be disclosed when they submit expert reports in support of class certification and/or merits, or as otherwise required by the Federal Rules of Civil Procedure.

237.    Engagement of these experts was necessary and indispensable to Class Plaintiffs' prosecution of the Action. Claims administration would not be possible without Velador's work on the transaction data, and Settling Defendants would not have entered into such high-value settlements without Lead Counsel being able to demonstrate a methodology that could prove a persistent unlawful conduct, class-wide impact, and damages.

238.    Another area of expense was for the hosting of databases for the documents and transaction data produced in this litigation.  Together these expenses were indispensable to the prosecution of the Action.  As to the document database, as described in §III.K. above, one of the reasons Lead Counsel selected Recommind as an outside vendor for hosting the documents was for its TAR capabilities.  Lead Counsel knew that document productions in this Action would consist of lengthy chat room transcripts, and therefore, the use of TAR would bring efficiencies to the document review.  Recommind's charges through and including December 31, 2017 were $1,597,977.45.

239.    As to establishing and maintaining a transaction database, Lead Counsel was unable to find an outside vendor that could meet the needs of the case.  These needs included: (i) an extraordinary amount of storage space and computing power, given the size of the transaction data and types of analysis that would be employed; (ii) the ability to comply with the protective order and the rigorous data security requirements of the financial industry; and (iii) the capacity for multiple experts to access the data simultaneously from different locations spread across 10 time zones.  Lead Counsel and Scott+Scott's Information Technology director, Ted McBride, interviewed multiple outside vendors but found no off-the-shelf software or custom solution that could meet these requirements.

240.    Accordingly, Scott+Scott engaged Mr. McBride to establish and maintain a secure environment for hosting and analyzing transaction data.  Mr. McBride works as the firm's Information Technology Director pursuant to a consultancy arrangement.  Because this work was outside the scope of the normal IT needs of the firm, Scott+Scott separately engaged Mr. McBride to procure the hardware and software and build and maintain the platform.  All of the hardware and software used was purchased exclusively for use in this Action.  Internally, we

call the platform the "Sandbox." The Sandbox resides in isolated server rack space at an SSAE 16/SOC 2 certified data center. This particular facility is used by several of the largest U.S. financial institutions for their East coast operations and meets or exceeds all financial industry security standards. The Sandbox gives the experts read-only access to the data in a virtual environment. All analysis is conducted inside the Sandbox, and external data transfer is disabled at the gateway/firewall. Total charges for the Sandbox through and including December 31, 2017 were $1,656,880.66. The equipment portion of these charges included a $46,470.34 discount of the estimated residual value of the equipment at the end of its service life for this case, which was assumed to be December 31, 2019.

241.    Lead Counsel incurred other reasonable expenses in prosecuting the Action: (i) mediation fees; (ii) Court fees and service of process; (iii) out-of-pocket payments for online factual and legal research; (iv) court reporters and transcripts; (v) travel and meals; and (vi) other expenses, such as document reproduction, telephone and facsimile, postage and delivery, and secretarial overtime. These expenses are reasonable and were necessarily incurred.

242.    Notably, in order to limit expenses, Lead Counsel imposed internal "caps" on certain expenses incurred by Plaintiffs' Counsel based on the application of the following criteria:

(a)    For out-of-town travel, airfare is at coach rates.

(b)    Hotel charges per night are capped at $350 for large cities (London, United Kingdom; Chicago, IL; Washington, D.C.; and New York, NY) and $250 for all other cities.

(c)    Meals are capped at $20 per person for breakfast, $25 per person for lunch, and $50 per person for dinner.

(d)    Internal copying is charged at $0.10 per page.

(e)    Online research charges reflect only out-of-pocket payments to the vendors for research done in connection with this litigation. Online

71

research is billed based on actual time usage at a set charge by the vendor. There are no administrative charges included in these figures.

## VI.    SUMMARY OF GLOBAL REGULATORY AND ENFORCEMENT ACTIONS

243.    This section describes the outcomes of the global regulatory and enforcement actions concerning misconduct in the FX market.   As important as these results are, and as commendable the work of investigators around the world has been, the scope of these actions, taken together, does not match the scope of the investigation that Plaintiffs' Counsel have carried out in this Action.   Unlike the focused and often limited nature of the government actions described below, Class Plaintiffs' burden in this Action is to show a pervasive and continuous set of unlawful actions, involving a far greater number of currency pairs on more transaction types over a longer time period.   Furthermore, Class Plaintiffs have the additional burden of showing class-wide impact and damages at class certification, summary judgment, and trial, which requires construction and complex analysis of an extraordinarily large transaction database.

244.    On November 11, 2014, the CFTC fined Citigroup, HSBC, JPMorgan, RBS, and UBS for attempted acts of manipulation of commodities in interstate commerce in violation of the CEA and Commission Regulations.   The CFTC found that due to weak internal controls and supervisory failures, the banks, through certain unnamed FX traders, attempted to manipulate and aided and abetted certain FX traders at other banks to attempt to manipulate, FX benchmark rates – primarily the WM/Reuters Closing Spot Rates for the U.S. Dollar, Euro, and British Pound Sterling.   The CFTC stated the collusive conduct was carried out through communications in chat rooms and cited several examples specific to each fined bank.   In the UBS Order, for example, the CFTC provided a general description of the use of chat rooms by FX traders, cited one example of a UBS trader and two other bank traders discussing whether to invite a fourth trader into a chat room, and cited two examples of UBS traders exchanging client fixing orders

with traders at other banks.[9]  In the Citigroup Order, for example, the CFTC provided two examples of a Citibank trader and a trader at another team coordinating their trading on EUR/USD ahead of 4 p.m. London time and another example of a Citigroup trader coordinating with traders at three other banks to manipulate the EUR/USD and USD/CHF fixes at 3:16 p.m.[10] On May 20, 2015, the CFTC also fined Barclays Bank PLC for similar conduct.

245.    On November 11, 2014, the U.K. FCA fined Citigroup, HSBC, JPMorgan, RBS, and UBS for breaches of Principle 3 of the Authority's Principles for Businesses for failure to properly identify, assess, and manage London-based voice trading operations in the G10 spot FX market.  This allowed unnamed FX traders to put their respective employer's interests ahead of client interests and included: (i) attempts to manipulate WM/Reuters ("WMR") and European Central Bank ("ECB") fix rates in collusion with traders at other firms; (ii) attempts to trigger clients' stop loss orders; and (iii) inappropriate sharing of confidential information, including specific client identities and clients' WMR and ECB fix orders and stop loss orders.  The U.K. FCA stated the collusive conduct was carried out through communications in chat rooms and cited several examples specific to each fined bank.  In the Citibank, N.A. Final Notice, for example, the U.K. FCA cited one example of Citibank, N.A. traders attempting to manipulate the ECB fix in the EUR/USD currency pair, two examples about triggering stop loss orders, and a general description of inappropriate sharing of confidential information by the bank.[11]  On May 20, 2015, the U.K. FCA also fined Barclays for similar conduct.

---

[9]     *In the Matter of: UBS AG*, CFTC Docket No. 15-06, Order Instituting Proceedings, Making Fines, and Imposing Remedial Sanctions (Nov. 11, 2014), http://bit.ly/2x8nc7S.

[10]    *In the Matter of: Citibank, N.A.*, CFTC Docket No. 15-03, Order Instituting Proceedings, Making Findings, and Imposing Remedial Sanctions (Nov. 11, 2014), http://bit.ly/2x8nc7S.

[11]    *Final Notice to Citibank N.A.*, No. 124794 (Nov. 11, 2014), http://bit.ly/2C7DWiS.

246.    On November 11, 2014, the OCC fined Bank of America, Citigroup, and JPMorgan for engaging in unsafe or unsound practices in their FX trading businesses.  The OCC found the banks, through unnamed FX traders, encountered possible conflicts of interest between trading to maximize the banks' profit or the trader's profit (or both) and for providing fair execution to the banks' customers.  The OCC also found that the banks' unnamed FX traders used electronic messaging platforms to discuss engaging in potential misconduct with FX traders from other unnamed banks, including to: (i) coordinate trading strategies to manipulate the WMR or ECB fix rates; (ii) trigger customers' limit orders, such as stop loss or take profit orders; (iii) trade ahead of customers' orders; and (iv) disclose confidential bank information, such as customer order flows and FX rate spreads.  In JPMorgan's and Citigroup's Consent Orders, the OCC also found that JPMorgan and Citibank traders discussed entering into agreements not to trade in a particular (unnamed) currency pair while other traders were doing so.[12]

247.    On November 12, 2014, Swiss FINMA fined UBS AG for violating the Swiss requirements for proper business conduct and adequate organization by attempting to manipulate FX benchmarks and acting against the interests of its clients.  FINMA found that UBS did not have concrete internal directives or guidelines for using chat rooms and traders were encouraged by their superiors to actively participate in chat groups with clients and traders at other banks to exchange information. FINMA found that UBS, at times in coordination with other banks: (i) triggered client stop loss orders; (ii) engaged in front running client orders; (iii) partially filled clients' foreign exchange transactions; (iv) disclosed confidential client information;

---

[12]    *In the Matter of: JPMorgan Chase Bank, N.A.*, No. AA-EC-14-100 (Nov. 11, 2014), http://bit.ly/2CVQHuc; *In the Matter of: Citibank, N.A.*, No. AA-EC-14-101 (Nov. 11, 2014), http://bit.ly/2CG1Baj.

(v) condoned actions in bad faith by third parties; and (vi) occasionally deceived customers with regard to sales mark-ups.  The FINMA Report contained an appendix with 16 extracts from chat groups that UBS participated in.[13]

248.    On May 20, 2015, Barclays, Citigroup, JPMorgan, and RBS pleaded guilty to criminal antitrust charges under Section 1 of the Sherman Act, 15 U.S.C. §1, for entering into and engaging in a conspiracy to fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for the EUR/USD currency pair in the FX spot market, beginning in December 2007.[14]  The conduct in the plea agreements related to unnamed FX traders at the banks using chat rooms (referred to as "The Cartel" or "The Mafia") on a near-daily basis to discuss: (i) coordinating trading of the EUR/USD currency pair in connection with the ECB and WMR fixes; and (ii) refraining from certain trading behavior when one conspirator had an open position.  DOJ found that the banks, through unnamed currency traders and sales staff, also intentionally worked customers' limit orders up one or more levels away from the price confirmed with the customer and disclosed non-public information.

249.    Also on or about May 20, 2015, DOJ's Antitrust Division granted UBS conditional immunity from criminal antitrust charges for unlawful conduct in the FX market but, based in part on that conduct, found UBS in violation of its 2012 non-prosecution agreement

---

[13]    *Foreign exchange trading at UBS AG: investigation conducted by FINMA* (Nov. 12, 2014), http://bit.ly/2CDPOIV.

[14]    Specifically, DOJ found that:  (i) Barclays participated in the conspiracy from as early as December 2007 until at least August 2012 (*United States v. Barclays PLC*, No. 3:15-cr-00077-SRU (D. Conn. May 20, 2015), ECF No. 6); (ii) Citicorp participated in the conspiracy from December 2007 until January 2013 (*United States v. Citicorp*, No. 3:15-cr-00078-SRU (D. Conn. May 20, 2015), ECF No. 8); (iii) JPMorgan participated in the conspiracy from as early as July 2010 until at least January 2013 (*United States v. JPMorgan Chase & Co.*, No. 3:15-cr-00079-SRU (D. Conn. May 20, 2015), ECF No. 13); and (iv) RBS participated in the conspiracy from as early as December 2007 until at least April 2010 (*United States v. The Royal Bank of Scotland PLC*, No. 3:15-cr-00080-SRU (D. Conn. May 20, 2015), ECF No. 9).

with DOJ related to UBS's submissions in connection with London Interbank Offered Rate for Japanese yen ("Yen LIBOR") and other benchmark interest rates. UBS AG pleaded guilty to a one-count information charging wire fraud, in violation of 18 U.S.C. §§1343 & 2, related to Yen LIBOR.[15] UBS's DOJ plea agreement stated that with regard to its FX business, certain UBS employees engaged in the following misconduct: (i) misrepresenting to UBS's "open line" customers that there was no sales markup being added to execute the customers' transactions when UBS added undisclosed markups; (ii) "tracking" or "working" customers' limit orders or portions of limit orders at a price level different than what the customer specified; and (iii) conspiring with other financial services firms to restrain trade in the purchase and sale of the EUR/USD currency pair from October 2011 through January 2013 by, among other things, coordinating trading around the ECB and WMR fixes and withholding bids and offers when one conspirator had an open risk position.

250. On May 20, 2015, the New York State Department of Financial Services ("NYDFS") fined Barclays for conducting banking business in an unsafe and unsound manner, as well as violations of Banking Law §200-c and 3 NYCRR §300.1. NYDFS found that due to a lack of internal controls and compliance, employees engaged in a conspiracy to coordinate trading, attempted to manipulate exchange rates, and coordinated bid-ask spreads in order to benefit the bank's trading positions. NYDFS stated that from 2008 through 2012, Barclays, through certain FX traders, communicated with traders at other banks via chat rooms to manipulate the WMR and ECB fixes by exchanging order information, coordinating trading, agreeing to stay out of the market, and discussing spreads. The Consent Order stated that

---

[15]    *United States v. UBS AG*, No. 3:15-cr-00076-SRU (D. Conn. May 20, 2015), ECF Nos. 1, 6.

Barclays participated in an exclusive chat room for Euro traders, referred to as "The Cartel," with FX traders from Citigroup, JPMorgan, UBS, RBS, and Barclays and included several examples of chats from the Cartel.  NYDFS also found that from 2009 to 2012, Barclays FX Emerging Markets traders attempted to coordinate their pricing and trading for certain emerging markets currency pairs with unnamed traders at JPMorgan, Standard Chartered, and RBC. Barclays agreed to terminate four employees and terminated four other employees the month before the Consent Order was released.[16]  In 2017, the NYDFS also fined BNP Paribas and Credit Suisse for similar misconduct conduct in the FX market, related to conducting business in an unsafe and unsound matter, in violation of Banking Laws §§10, 44, and 44-a, Banking Law §200-c, and 3 NYCRR §300.1.  For example, the NYDFS Consent Order against BNP Paribas described an unnamed trader's scheme to manipulate FX prices of the South African Rand, traders' coordination of prices offered to customers in order to boost the traders' profits, improper sharing of confidential information, improper coordination around the daily benchmark fixes, and misleading sales practices.[17]  With respect to Credit Suisse, NYDFS found that Credit Suisse colluded on spreads with other banks, shared confidential client trading information with other banks, and front ran trades to the detriment of their clients.[18]

---

[16]    *In the Matter of Barclays Bank PLC*, Consent Order Under New York Banking Law §§44 and 44-a (May 20, 2015), http://on.ny.gov/2Ct8bgw.

[17]    *In the Matter of BNP Paribas S.A.*, Consent Order Under New York Banking Law §§39, 44 and 44-a (May 24, 2017), http://on.ny.gov/2lTFySB.

[18]    *In the Matter of Credit Suisse AG, Credit Suisse AG, New York Branch,* Consent Order Under New York Banking Law §§39, 44 and 44-a (November 13, 2018), http://on.ny.gov/2En135R.

251.    On May 20, 2015, the Board of Governors of the Federal Reserve System ("Federal Reserve") fined Barclays, Bank of America, Citigroup, JPMorgan, and UBS[19] for lack of adequate governance, risk management, compliance, and internal policies and procedures which permitted the banks, through unnamed FX traders, to use chat rooms to communicate with traders at other institutions regarding: (i) coordinating trading positions, including fix-related trading; (ii) trading strategies that raised potential conflicts of interest; and (iii) disclosing confidential information. The Federal Reserve found that Barclays, Citigroup, JPMorgan, RBS, and UBS used electronic messaging platforms to discuss possible agreements with traders of other institutions regarding bid-offer spreads offered to their FX customers.[20] In 2017, the Federal Reserve also fined Deutsche Bank, BNP Paribas, and HSBC for similar misconduct. For example, in Deutsche Bank's Consent Order, the Federal Reserve found that a Deutsche Bank trader discussed rigging bid-offer spreads offered to Deutsche Bank's FX customers for FX non-deliverable forward contracts and Deutsche Bank traders discussed trading in a manner to trigger or defend certain FX barrier options.[21]

252.    On December 7, 2016, Brazil's competition authority, the Council for Economic Defense ("CADE"), fined Barclays, Citigroup, Deutsche Bank, HSBC, and JPMorgan for misconduct in the FX market. CADE's decision was not publically released.

---

[19]    The Connecticut Department of Banking joined the cease and desist provisions of the Federal Reserve's action against UBS AG, which has a branch in Stamford, Connecticut.

[20]    *See, e.g., In the Matter of UBS AG*, Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, No. 15-005-B-FB (May 20, 2015), http://bit.ly/2qr7Vgi.

[21]    *In the Matter of Deutsche Bank AG*, Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended (Apr. 20, 2017), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20170420a1.pdf.

253.    On February 21, 2017, South Africa's Competition Commission entered into a settlement agreement with Citigroup related to misconduct in trading in the South African currency pairs.

254.    Simply put, this is a far different and higher burden than those faced by regulators and law enforcement officials, and the information that they generated in their investigations provided very little *evidence* upon which Plaintiffs' Counsel could rely in prosecuting this Action.  There was no piggybacking in this case, and but for the efforts of Plaintiffs' Counsel, the Settlement Classes would have received nothing.

## VII.    EXHIBITS

255.    Attached as Exhibits are true and correct copies of:

| EXHIBIT | TITLE |
|---|---|
| 1 | Summaries of Plaintiffs' Counsel's Hours, Lodestar, and Expenses |
| 2 | Declaration of Daryl F. Scott in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Scott+Scott, Attorneys at Law, LLP |
| 3 | Declaration of Michael D. Hausfeld in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Hausfeld LLP |
| 4 | Declaration of George A. Zelcs in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Korein Tillery, LLC |
| 5 | Declaration of David Kovel in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Kirby McInerney LLP |
| 6 | Declaration of Gregory S. Asciolla in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Labaton Sucharow LLP |
| 7 | Declaration of Vincent Briganti in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Lowey Dannenberg, P.C. |
| 8 | Declaration of David W. Mitchell in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Robbins Geller Rudman & Dowd LLP |
| 9 | Declaration of Daniel J. Mogin in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of MoginRubin LLP |

| EXHIBIT | TITLE |
|---|---|
| 10 | Declaration of Joshua D. Snyder in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Boni & Zack LLC |
| 11 | Declaration of William J. Leonard in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Obermayer Rebmann Maxwell & Hippel LLP |
| 12 | Declaration of Allan Steyer in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Steyer Lowenthal Boodrookas Alvarez & Smith LLP |
| 13 | Declaration of Jennifer W. Sprengel in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Cafferty Clobes Meriwether & Sprengel LLP |
| 14 | Declaration of Linda P. Nussbaum in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Nussbaum Law Group, P.C. |
| 15 | Declaration of Patricia I. Avery in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Wolf Popper LLP |
| 16 | Declaration of Andrew J. Entwistle in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Entwistle & Cappucci LLP |
| 17 | Declaration of Robert G. Eisler in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Grant & Eisenhofer, P.A. |
| 18 | Declaration of Michael M. Buchman in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Motley Rice LLC |
| 19 | Declaration of Joseph D. Cohen in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 20 | Declaration of Todd Seaver in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Berman Tabacco |
| 21 | Declaration of Michael Eisenkraft in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Cohen Milstein Sellers & Toll PLLC |
| 22 | Declaration of Louis F. Burke in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Louis F. Burke P.C. |
| 23 | Declaration of Michael E. Criden in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Criden & Love, P.A. |
| 24 | Declaration of C. Andrew Dirksen in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Cera LLP |

| EXHIBIT | TITLE |
|---|---|
| 25 | Declaration of Patrick F. Morris in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Morris and Morris LLC Counselors at Law |
| 26 | Declaration of C. Moze Cowper in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Cowper Law LLP |
| 27 | Declaration of Daniel Cohen in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Cuneo Gilbert & LaDuca, LLP |
| 28 | Declaration of Michael J. Freed in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Freed Kanner London & Millen LLC |
| 29 | Declaration of Renae D. Steiner in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Heins Mills & Olson, P.L.C. |
| 30 | Declaration of Eric L. Young, Esquire in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Young Law Group, P.C. |
| 31 | Declaration of John D. Radice in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of the Radice Law Firm, PC |
| 32 | Declaration of Adam Frankel in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Greenwich Legal Associates, LLC |
| 33 | Declaration of Derek W. Loeser in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Keller Rohrback L.L.P. |
| 34 | Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 EMPIRICAL LEGAL STUD. 248 (2010) |
| 35 | Theodore Eisenberg, Geoffrey Miller, and Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937 (2017) |
| 36 | Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010) |
| 37 | Declaration of Professor Geoffrey P. Miller |
| 38 | Declaration of Brian T. Fitzpatrick |
| 39 | Report of Professor Charles Silver on the Reasonableness of Class Counsel's Request for an Award of Attorneys' Fees |

## VIII.    CONCLUSION

256.    In view of the significant recovery for the Settlement Classes and the substantial risks of this litigation, Lead Counsel respectfully submit that the Settlement Agreements should be approved as fair, reasonable, and adequate and that the Plan of Distribution should be

approved as fair and reasonable.  In addition, based on the significant recovery for the Settlement Classes in the face of substantial risks through the efforts of Lead Counsel and Plaintiffs' Counsel, Lead Counsel respectfully submit that the Court should award attorneys' fees in the amount of 16.51% of the Settlement Fund, or $381,353,830.27, plus interest and approve reimbursement of $22,495,669.73 in litigation expenses.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 12, 2018, in San Diego, CA.

_s/_ Christopher M. Burke
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile: 619-233-0508
cburke@scott-scott.com

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 12, 2018, in Washington, DC.

MICHAEL D. HAUSFELD
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: 202-540-7143
Facsimile:  202-5407201
mhausfeld@hausfeldllp.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 12, 2018.

_s/_ Christopher M. Burke
CHRISTOPHER M. BURKE
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
email: cburke@scott-scott.com